# Wytheville.

PEIRCE v. GRAHAM AND ALS.

August 16th, 1888.

85   227
89   547
85   227
100   12

1. PERSONAL REPRESENTATIVES—*Decedent's real estate—Judicial sales—Jurisdiction.*—Executor, who is given no power as to the realty under the will, is not authorized by the statute (Code 1887, ? 2665) to maintain a suit against the heirs to sell the realty to pay debts, nor, as next friend to the infant heirs, uniting the widow, to compel the creditors to have the realty sold to pay debts.

2. IDEM—*Defective jurisdiction—Decree—Bill of review.*—Where the court had jurisdiction over the parties and subject-matter, its decree, though erroneous, is binding until reversed, though it had no jurisdiction to entertain such suit. Hence, a bill of review lies to vacate the decree.

3. IDEM—*Dower—Sale—Consent through threats.*—Where widow was induced to consent to sale of dower by menace of erection, by purchasers of her children's land, of a furnace near her residence, has cause to have the sale set aside, the sale of her children's land having been cancelled.

4. IDEM.—Where a decree ordered public sale, but it was made privately; ordered as much land sold as would pay $8,000 of debts, but $35,000 worth was sold; and where the executor, who brought the suit and by his own counsel managed it all the way through, was in fact the purchaser, though but the nominal bidder:

HELD:

The purchaser can have no protection in the purchase.

Appeal from decree of circuit court of Wythe county, entered December 21st, 1887, in vacation, in the chancery cause wherein Emeline D. Peirce, and Isaac, David, Martha, and James Peirce, the last four being infants suing by their next friend, were complainants, and M. P. Tate, James S. Crockett, John W. Robin-

son, D. P. Graham, R. C. Hoffman, James Moore, The Foster Falls Mining and Manufacturing Company, and W. C. Bullitt, were defendants. By said decree the said circuit court dismissed the plaintiffs' bill and adjudged the costs against them. Opinion states the case.

*F. S. Blair, W. H. Bolling,* and *Henry & Graham,* for the appellants.

*D. S. Peirce,* and *Walker & Walker,* for the appellees.

LACY, J., delivered the opinion of the court.

The history of this controversy, as it is set forth in the transcript before us, is briefly stated as follows: On the 6th day of June, 1875, William Peirce, of the county of Wythe, died, leaving the appellant, Emeline Peirce, and their five infant children, the other appellants, surviving him; the oldest child at that time being in his tenth year, and the youngest in his third year. His will was duly probated, by which he gave to his wife one-third of his property for life. The residue, including the remainder at the death of his wife, he divided equally among his children; and by his will appointed two of his friends, John C. Roper and David P. Graham, his executors, but the latter, who was his relative, alone qualified as executor. The real estate of the said William Peirce consisted of twenty-one hundred acres by a recent survey, and is very valuable. On the 31st day of January, 1876, seven months after the death of the said William Peirce, Graham, the said executor, instituted a suit in chancery, in which the widow and children were joined as plaintiffs, against William Gibboney and others, creditors of the estate of the said Peirce; the object of this suit being to sell the real estate to pay debts of the estate. An account was ordered in the cause in vacation, on the 4th day of August, 1876, of the transactions of the executor and of the debts of the estate. The latter appeared

to be, principal and interest, $8,406.13. At the next ensuing term of the circuit court of Wythe, the bill was taken for confessed, and the report of the commissioner of the debts, etc., confirmed, and a further account ordered of the debts, and a commissioner appointed to sell, rent or lease for a term of years the real estate in the bill mentioned. This commissioner was shortly removed and another appointed at the March term, 1879, to execute former decrees in the cause, to sell the lands, or so much as might be necessary to pay the debts, subject to the widow's dower; $800 to be required in cash, and the residue upon a credit of one, two and three years' equal instalments.. This was at the March term, 1879. In October following another bill was filed by the executor against the widow and her infant children, having the same object as the first; and, at the December term following, the bill was taken for confessed as to all the defendants, and a guardian *ad litem* appointed, who filed a formal answer; and, at another day in the same term, another decree was rendered, by which the two causes were brought on to be heard together, and the same commissioner ordered to execute former decrees. At the March term following, 1880, a decree was rendered in the cause, confirming a sale in the meantime made, and referred to in the decree. A report of this sale, filed in the papers in the cause at some time, undated and unindorsed (which is objected to for that cause), sets forth that this sale was made March, 1880, to "Messrs. Crockett & Co., *i. e.,* to M. B. Tate, John W. Robinson, and James S. Crockett," for $35,000, $2,000 in cash, and residue on a credit of one, two, and three years, and that in this sale the widow's dower was included by permission. At the March term, 1880, this sale was confirmed, and the widow's dower valued by report of commissioner at $7,824.40. By decree of the March term, 1881, the same commissioner was ordered to collect bonds and pay debts *pro rata.* At the March term, 1882, the guardian of the children was required to give bond in the penalty of $30,000. At the September term, 1882, the said

commissioner was directed to make a deed to the purchasers of this land, to-wit: M. B. Tate, James S. Crockett, John W. Robinson, D. P. Graham, R. C. Hoffman, and James Moore, who do business as the New River Iron Company, or such other name as they direct. And at the December term, 1883, it is recited that the said deed had been by the direction of the said persons made to "The Foster Falls Manufacturing Co." At the September term, 1886, a decree was rendered in the cause by which a report of the commissioner was received and confirmed; and, it appearing therein that $22,988.24 had been collected and disbursed, less $112.37, and that the residue of the purchase money had not been collected, but had been secured by a lien retained on the face of the deed made to the said "The Foster Falls Manufacturing Co.," as a lien in favor of the heirs of William Peirce, it was recommended that the said balance remain as it is—that is, uncollected—as a safe investment for the infant heirs, and by the decree it was so left; and the $112.37 in hand decreed to be paid over to John W. Robinson, guardian of the infant children of William Peirce, deceased, and the cause stricken from the docket; this decree being rendered, as stated, at the September term, 1886.

At rules, on the first Monday in February, 1887, the said Emeline Peirce, the widow of William Peirce, and the five children, Isaac, William, David, Martha, and James Peirce, the last four being still infants, suing by their mother, the said Emeline Peirce, as their next friend, filed their bill of review in the cause against M. B. Tate, James S. Crockett, John W. Robinson, D. P. Graham, R. C. Hoffman, James Moore, "The Foster Falls Manufacturing Co.," and W. C. Bullitt, in which, after setting forth the foregoing, they ask that the several decrees heretofore rendered in the cause, as stated above, may be reviewed, reversed, and annulled, and that the sale of the land already mentioned, to D. P. Graham and others, be set aside and annulled; and, these having effected a sale of this property to the said W. C. Bullitt at the price of $150,000, that this sale

be enforced as against Bullitt for their benefit. The complainants in this bill set forth many errors in the record of the said suits to their prejudice, whereby their inheritance was lost to them, and characterize the proceedings an anomaly in chancery pleading and practice. These errors are set forth at great-length under numerous heads. They are substantially as follows: That the suit by the executor, who had no powers granted under the will concerning the land, the same being devised to the wife and children of the testator, could ·not be maintained to sell the lands of the infants, and because the lands were subjected to pay the debts in advance of the personal assets; that the infants were, throughout the proceedings, unrepresented by counsel, except so far as their real adversary, the executor, supplied his own counsel; that there was no necessity to sell the lands to pay debts, no debts having been asserted against the estate, and no proof that the rents and profits would not pay the debts in five years, if such had been asserted against the estate; that the land was decreed to be sold publicly, and was in fact sold at a sacrifice privately; that the land was advertised as containing fifteen hundred acres, when it in fact contained twenty-one hundred acres, as the records of the county showed; that the decree directed so much land only to be sold as was necessary to pay the debts, whereas $35,000 worth of land was sold to pay a total indebtedness of some $8,000, and that this was a very great sacrifice, as is well-known and can be established by proof, the testator having refused $75,000 for the land, and an actual sale had been made *pendente lite,* bringing $150,000 for the land, and this before the purchase-money had been paid under the first sale; that the executor, the artificer who wrought all this injury, who was their father's executor, their next friend, who had their mother removed as their guardian, and had his brother-in-law appointed in her stead—that this multiform friend was in fact and substance the purchaser of their inheritance, and paid, under the sanction of this court, the purchase-money into the hands of his brother-in-law and co·purchaser, not in money, but in a bond

to be held for them, secured on their own land, while, in advance of becoming a complete purchaser, he had speculated on the property through a wide range, and, while they had left only a few thousand dollars of a princely inheritance, he, without the expenditure of the purchase-money, had, by a skillful use of his trust relations, realized an immense fortune; that while throughout the proceedings now called in question they were never represented by counsel except the attorney of this executor, and that from first to last the will of William Peirce was never exhibited in these causes; that some time before his death, William Peirce had an inclusive survey made of his land by an accomplished surveyor, which was of record, showing an actual acreage of twenty-one hundred acres, and that this executor was a neighbor to this land, and knew every part of it; this land was really represented throughout the proceedings as fifteen hundred acres, and that the hand-bills advertising the sale represent that this land contains fifteen hundred acres, while the said purchaser and his associates knew well what they were buying, and took a deed by metes and bounds for twenty-one hundred acres, as the conveyance made to them shows, and a plat of this survey is made part of the deed; that there was fraud or collusion between these purchasers, and some of whom owned lands in the neighborhood and greatly coveted this land; that within seven months from the death of William Peirce, before the personal assets had been collected and administered, and before a debt had been demanded, such was the impatience of their desire to obtain this land that the executor hurried into court, under the guise of his office as such, to sell this princely estate to pay off a few thousand dollars of debts, in his paternal anxiety to save the children of his old friend from paying interest on the debts, which in fact these purchasers had already for the most part acquired as their own, and, in order to control the purchase-money for the land other than the amount to go to the creditors, a bond in excessive penalty was required of their guardian, and their mother removed as such, and the co-pur-

chaser and brother-in-law substituted as stated, and creditor and debtor neatly merged, and the said bond so remained to this day uninvested, $35,000 worth of land having been sold to pay $8,406.12 of debts, and the residue remaining unproductive in the hands of these co-purchasers; that the widow, under a mistake as to her rights, agreed at last, under much pressure, to suffer her dower to go, upon deceptive representations; and the sale, being illegal and void as to the co-plaintiffs, should be set aside as to her also.

The defendants demurred, and answered denying everything like bad faith, fraud and collusion; Graham claiming to have acted in all things for the good of the estate, and the purchasers claiming as *bona fide* and complete purchasers for value, and claiming the benefit of their purchase. Bullitt answered that he had purchased and paid $500, not $5,000, cash, upon condition that he could get a good title; but that he had not been satisfied with the title the "Foster Falls Manufacturing Co." could make, and had demanded a deed from the individual members of the firm, with general warranty; that Graham, the executor, was a purchaser, as appeared by the decree directing a conveyance of the property; that the corporation had never been legally organized; that the purchase-money had never been paid, and the title was clouded by liens under the decrees in the cause; that the individual members of the corporation refused to make him a deed with general warranty, and he was unwilling to accept the warranty of the corporation, as that would practically cease to exist as soon as the deed was made and the purchase-money paid, as that would be at once divided among the individuals; that the sale was made within six months after the date of the rendition of the decree, and Graham was one of the purchasers, and that, in addition to all this, the filing of the bill in this cause had thrown such additional cloud upon the title as to put an end to all his efforts to get the title perfected; that, by the terms of his contract, he was entitled long since to the possession of the property, which has not been given him, and cannot now, for a

longer time than he looked for, and he is released, and declines
to take the property at all.

Depositions were taken on both sides to sustain their respec-
tive assertions and denials; and, on the 21st day of December,
1887, a decree was rendered in the cause, dismissing the bill of
the complainants; whereupon they applied for and obtained an
appeal to this court.

The first assignment of error here is, that it was error to en-
tertain the suit of the executor to sell the land of the heirs to
pay the debts of the estate. This right is claimed for the exec-
utor by reason of the statute making real estate assets for the
payment of debts in the same order as the personal estate. This
statute, which was enacted in 1841–42, and which appears in
the Code of 1849 as the third section of chapter 131, is to be
found in the Code of Virginia at section 2665, and is as follows:
" All real estate of any person who may hereafter die, as to
which he may die intestate, or which, though he die testate,
shall not by his will be charged with or devised subject to the
payment of his debts, or which may remain after satisfying
the debts with which it may be so charged, or subject to which
it may be so devised, shall be assets for the payment of the dece-
dent's debts, and all lawful demands against his estate, in the
order in which the personal estate of a decedent is directed to
be applied." The next section (2666) provides how such assets
shall be administered: "Such assets, so far as they may be in
the hands of the personal representative of the decedent, may
be administered by the court in the office whereof there is or
may be filed, under the one hundred and twenty-first chapter, a
report of the accounts of such representative, and of the debts
and demands against the decedent's estate, or they may in any
case be administered by a court of equity." This statute has
frequently been under consideration in this court; but I find
no case, and none has been cited, where the question has come
up in this particular form, *i. e.*, where an executor with no
powers under the will to that end, has claimed the right to

maintain a suit against the heirs to have their real assets administered to pay the debts of the testator, or where, as in the first bill, the executor has claimed the right to take the widow in, and as next friend to them to take the infant heirs into court as plaintiffs to compel the creditors to sell the real estate to pay their debts. In *McCandlish* v. *Keen,* 13 Gratt. 630, Judge Lee, speaking of this statute, says: "The law makes real estate assets merely, to be disposed of as personal assets; and a creditor has no lien upon the assets. He has a right to have the whole applied in a due course of administration." In the familiar case of *Brewis* v. *Lawson,* 76 Va. 41, the court says: "The act of 1849 (Code 1873, ch. 127, § 3) [meaning this act, section 2665, Code Virginia] does not, we think, alter the rule (that it is settled in Virginia that no judgment against the executors can bind the heirs, or in any manner affect them). It makes real estate descended or devised (not charged by the will with debts) legal assets in the hands of the heirs and devisees; but there would seem to be the same lack of privity now as before between the personal representatives and the heir or devisee." As was said in that case, and is obvious from the statute, the creditor may come into a court of equity and sue the heir or devisee; section 6, ch. 127, Code 1873, provides that "an heir or devisee may be sued in equity by any creditor to whom a debt is due for which the estate descended or devised is liable, or for which the said heir or devisee is liable in respect to such estate; and he shall not be liable to an action at law for any matter for which there may be redress by such suit in equity." The executor is charged as such with the administration of the personal assets, and such real assets as may be charged with the payment of debts by the will; but otherwise his relations to the real estate, to the heir descended or devised, remain as heretofore; that is, as such, he has no concern with them whatever. *Litterall* v. *Jackson,* 80 Va. 604, and cases cited. If he has no interest in or right concerning, he has no capacity to bring a suit to sell it. His concern was with the personal assets, and his duty was to

administer them in due course; but the administration of the real assets, though subject to be administered in a court of equity in any case, are not so subject at his suit. The statute expressly provides that this shall be done at the suit of the creditor. It is a complete answer to a suit in any case that the plaintiff has no cause of action. And there can be no doubt that in this case the plaintiff had no cause of action, either in the first suit or in the second.

But it is urged for the appellees that if the circuit court was without jurisdiction, as is claimed by the appellants, to entertain this suit, that then, the decree being a nullity, it was no obstacle to an action of ejectment against the purchasers; and, the remedy being complete at law, the bill in this case must be dismissed. But this is not such a case. The circuit court had jurisdiction of the subject-matter of the suit, and of the parties, and its decree, while erroneous, was nevertheless binding on the parties until reversed for error.

But it is again insisted by the appellees that the sale in this case was a judicial sale, and that a fair purchaser is not bound to go through all the proceedings, and to look into all the circumstances, to see that the decree is right in all its parts. He has the right to presume the court has taken the necessary steps to investigate the right of the parties, and upon such investigation has properly decreed a sale. There can be no doubt that a purchaser is bound by the decree in the cause under which the sale is ordered to be made, and if he buys from a person not authorized to sell, or buys something not decreed to be sold, he can claim nothing under the decree. The decree under which the sale is made, confers, and at the same time limits and defines, the authority of the commissioner making the sale. The decree in this case was for a public sale; the sale was made privately. The decree was for the sale of as much of fifteen hundred acres of land as was necessary to pay debts. How much was this, the decree did not show; but an account taken and reported in the case showed that the debts, principal and interest, amounted

to about $8,000. The sale was for enough land to bring $35,000. But, beyond all this, the purchaser in this case was the very person who must be held to the fullest knowledge of all the circumstances involved; for it was upon his suit that all was done. He denies stoutly that he is a purchaser; but he cannot deny this: the deed is to him, and he has executed his bonds as such. He may not have been an original bidder—that is immaterial. He certainly is a purchaser; the record shows that fact on every hand. No advantage was taken of him. He is the author of the whole structure—filed both bills; ascertained all the debts (whether he purchased them or not); himself or his counsel paid all that had been paid; employed all the counsel in the case; and achieved all the results. His claim is that his endeavor was to save the estate from paying interest, and preserve it for the heirs. The effect, however, has been to save it for himself and his co-purchasers. *Lamar* v. *Hale,* 79 Va. 147.

But he insists that a bill of review will not lie because the final decree in the cause was rendered in December, 1883, and the bill of review was not filed until February, 1887, more than three years after the decree was rendered. But while the decree in December, 1883, might have been appealed from, it was not the final decree in the cause. That was not rendered until September, 1886, and the bill of review was in time.

It is further insisted that the sale was made more than six months after the decree was rendered under which the sale was made, and the purchaser is protected. But the record shows that the decree for the sale in the consolidated causes was rendered December, 1879, and the sale was made in March, 1880, less than six months afterwards.

The widow has made in her deposition a strong case for relief. She says that she was extremely averse to selling her share of the land which was her home, and was only induced to do so by the threat that the children's land was under the hammer and

would have to be sold, and that an iron furnace would be put up close to her house, and that she would be compelled to raise her children amid such surroundings. There was no legal sale of her children's land, and the enforced sale of hers, under such circumstances, ought not to be upheld. We think the decree for the sale of this land in this suit, and the decree confirming a sale of the land, were plainly erroneous, and that they should have been reviewed and annulled by the circuit court of Wythe county; and that the decree of the said court in this cause, rendered on the 21st day of December, 1887, dismissing the bill of the complainants, is erroneous and must be reversed and annulled, and a decree rendered here setting aside and annulling all the decrees rendered in the original causes of *Peirce's Ex'or* v. *Gibboney* and *Peirce's Ex'or* v. *Peirce et al.*, and the bills in these causes dismissed, and the parties restored to their former relations; the real estate of William Peirce, deceased, unlawfully and erroneously wrested from his widow and his children, to be held by them subject to the debts of the said William Peirce, for the enforcement of which the parties who have paid them shall be subrogated to the rights of the creditors, and shall have a lien on the said lands for their security; and that all the money paid to the widow and the heirs of William Peirce, on account of the purchase-money of the said lands, shall be refunded by them, and they shall hold their lands thus restored to them subject to a lien thereon to secure the said debts; and that, as far as may be, the parties shall be put *in statu quo* in this way. But these suits, having been improperly brought, and the plaintiff having no right to maintain them, will be dismissed, with costs against the said plaintiffs. And the parties in interest can proceed as they are advised for the adjustment of their relations to one another. The widow and children of the said William Peirce, deceased, will be restored to the possession of their lands, and to that end the necessary process shall issue. But we are of opinion that Bullitt cannot be compelled to speci-

fically perform his agreement under the circumstances. If he were compelled to specifically perform his contract, it should be performed as he made it, and this cannot now be done, and he is entitled to be released out of the controversy, which is none of his making. And a decree will be rendered here in accordance with the foregoing views.

RICHARDSON, J., dissented.

DECREE REVERSED.