## Staunton.

## CATRON V. BOSTIC AND OTHERS AND HORTON V. BOSTIC AND OTHERS.

### September 19, 1918.

1. CREDITORS' SUIT—*Bill Filed by Creditor of Decedent's Estate—Executors and Administrators.*—Where a bill is filed by a creditor of a decedent's estate, suing on his own behalf only, and the court orders an account of debts to be taken in the case, it becomes a creditor's bill upon the entry of the order, and the complainant loses his dominion over the suit.

2. EXECUTORS AND ADMINISTRATORS—*Debts of Decedent—Sale of Realty—Suit by Administrator.*—A bill charging that the personal estate of a decedent was insufficient to pay the decedent's debts, and praying for a sale of the real estate or so much thereof as might be necessary to pay the debts, cannot be maintained by an administrator.

3. EXECUTORS AND ADMINISTRATORS—*Debts of Decedent—Sale of Realty—Suit by Administrator.*—The administrator has nothing to do with the land, except to collect the rents accrued during the lifetime of the decedent, and he has no capacity to bring a suit to sell it. His concern is solely with the personal estate which it is his duty to administer. If that is not sufficient to pay the debts of the intestate, it is no concern of his administrator. The creditors have their remedy against the heirs to subject the real estate which is made assets for the payment of their debts by section 2665 of the Code of 1904, but the administrator has no such right. The real assets are not subject to be administered at the suit of the administrator of an intestate, in the absence of a statute conferring such right. In this State, the right to subject the real assets is expressly given to the creditor. It is not extended to the administrator of the intestate. Code of 1904, section 2668.

4. EQUITY — *Jurisdiction — Dismissal—Objections.*—Whenever it is brought to the attention of a court of equity, or it discovers that a bill does not state a case proper for relief in equity, it will dismiss it, though no objection was taken to the jurisdiction by the defendant in his pleadings. The want of equity

is the want of jurisdiction in such case, and though the defendant took no notice of the defect but defended on the merits, and the case was heard and decided on the merits, the Supreme Court of Appeals will reverse and dismiss where there is such lack of jurisdiction.

5. CREDITORS' SUIT—*Debts of Decedent—Parties.*—If a bill be filed by a general creditor of a decedent for the purpose of subjecting his real as well as his personal estate, not only are the heirs necesary parties defendants, but the personal representative also.

6. CREDITORS' SUIT—*Debts of Decedent—Parties—Case at Bar.*— In the case at bar, the complainant was the personal representative of the decedent, but he was not brought before the court in that capacity. The widow of the decedent was entitled to dower in his real estate, and she and the decedent constituted a partnership, whose assets were sought to be subjected in the suit. She was, therefore, a necessary party as such surviving partner, and also in her individual capacity, as the bill asked for a sale of the land of which she was to be endowed.

7. APPEAL AND ERROR—*Judgments and Decrees—Presumption in Favor of.*—There is every presumption that a statement in a decree is correct.

8. CREDITORS' SUIT—*Parties.*—In a creditor's suit brought by one creditor, it is not necessary that all the other creditors be served with process, as such creditors are not necessary parties.

9. INFANTS—*Guardian Ad Litem—Creditors' Suit.*—Where infants were entitled to a share in a decedent's estate, and in the prayer of a bill by a creditor to subject the real estate of the decedent to his debts, it was asked that a guardian *ad litem* be appointed, but no names were given, no process was served on them, no guardian *ad litem* appointed, and no answer filed by or for them, their interests are unaffected by any proceedings in the cause.

10. DEMURRER—*Grounds of Demurrer—Code of 1904, Section 3271.*— Grounds of demurrer need not be stated unless required by some party to the cause or by the court.

11. PARTIES—*Irregularities in Procedure—Waiver.*—Where no objection is made to defect of parties or irregularities in the procedure, and such defects and irregularities do not affect the jurisdiction of the court or the ability of the court to do justice between the parties to the controversy, they will not be noticed by the court, and will be deemed to have been waived.

12. FRAUDULENT AND VOLUNTARY CONVEYANCES—*Void or Voidable.*— A conveyance of land with intent and for the purpose of hindering and evading the vendor's creditors is not void, but void-

able only. It is valid between the parties and neither can undo it without the consent of the other; but it is void as to the creditors of the vendor. In the absence of evidence of an intent by the purchaser to defraud his creditors, they cannot assail the transaction.

13. FRAUDULENT AND VOLUNTARY CONVEYANCES—*Absence of Fraud —Creditor of Purchaser.*—If there is no evidence of an intent on the part of the debtor to hinder, delay or defraud his creditors, they cannot assail a purchase of land by him, even though he made a bad bargain and agreed to pay more for the land than it is worth. In the absence of fraud, unsecured creditors cannot question the contracts of their debtors and undo all that is not beneficial to them.

14. BILLS, NOTES AND CHECKS—*Bona Fide Holder.*—The fact that the purchaser of notes before maturity purchased them for a sum considerably less than their face value, and attempted to get even a greater discount, did not charge the purchaser with knowledge of equities inhering in the notes.

15. BILLS, NOTES AND CHECKS—*Bona Fide Purchaser—Burden of Proof.*—The holding of a purchaser for value, before maturity, is *prima facie bona fide*, and the burden is on the party denying the *bona fides* of the transaction to prove his case, as the law will not presume fraud. Of course, the evidence may be circumstantial, but the proof of the existing circumstances amounting to implied notice must be clear.

16. BEST AND SECONDARY EVIDENCE—*Records.*—Testimony of witnesses as to suits pending in a sister State, and as to what had been done therein, is inadmissible, as the records of the court are the best evidence as to such matters.

17. PARTNERSHIP—*Sale of Individual Real Estate.*—The individual real estate of a partner cannot be subjected to partnership debts before the debts have been reduced to judgment, and it is error to decree a sale of such real estate to pay unsecured debts.

18. CREDITORS' SUIT—*Judicial Sales—Unsecured Debts.*—Real estate of a debtor cannot be sold to pay his unsecured debts. A court of equity has no such power.

19. RECORD—*Proceedings at Rules.*—The procedings at the rules are a part of the record of the court (Code of 1904, sections 3236 and 3237).

20. INFANTS—*Guardian Ad Litem.*—Where the interests of infants are concerned it must affirmatively appear from the record that a guardian *ad litem* was duly appointed. Where the record is silent on the subject, it will not be presumed.

Appeal from a decree of the Circuit Court of Wise county. Decree for complainant. Defendants appeal.

*Reversed.*

The opinion states the case.

*Irvine & Stuart* and *Morison, Morison & Robertson,* for the appellants.

*Bullitt & Chalkley, W. S. Mathews* and *Geo. L. Taylor,* for the appellees.

BURKS, J., delivered the opinion of the court.

These are separate appeals from the same decree of the Circuit Court of Wise county, in a suit in chancery instituted by D. H. Bostic against Nelson P. Horton and others.

In March, 1914, W. H. Horton died intestate, leaving surviving him his widow, S. A. Horton, and several brothers and sisters as his only heirs at law. Shortly thereafter D. H. Bostic qualified as his administrator. At the time of his death Horton owned some real estate, but practically *no personal estate;* and was considerably indebted. The whole personal estate charged to the administrator consisted of "books in possession of administrator per appraisement $25.00." His debts reported in this cause amounted to $5,079.96. During his lifetime he and his wife were partners in a mercantile business under the style of S. A. Horton & Co. At the time of his death, the partnership owed debts amounting to about $3,700, and owned assets amounting to about $1,750. In June, 1914, D. H. Bostic who held a claim against W. H. Horton amounting to $26.00 and a claim against the firm of S. A. Horton & Co. amounting to $16.80, filed the bill in the cause which led to the decree from which these appeals were taken.

The bill in this case is so inartificially drawn, and is such a departure from well recognized forms of procedure, that we have had great difficulty in determining its exact nature. Is it (1) a bill filed by the complainant as administrator of W. H. Horton, or (2) a bill filed by a creditor of a decedent's estate, suing on his own behalf only, or (3) a general creditor's bill? The distinction between the last two mentioned is immaterial, as an account of debts was ordered and taken in the case, and it became a creditor's bill upon the entry of the order, and the complainant then lost his dominion over the suit, even if it was his individual suit before that time. *Piedmont, etc., Life Ins. Co.* v. *Maury,* 75 Va. 508.

Some of the statements of the bill indicate that the complainant thought he was suing as administrator of W. H. Horton, for example, in the prayer for relief is the prayer, that "your orator's accounts as administrator of the said W. H. Horton, deceased," may be taken, stated and settled before a commissioner of the court, and yet "your orator" is D. H. Bostic, and neither as complainant nor defendant is he made a party as administrator of W. H. Horton. In speaking of certain partnership assets of the firm of S. A. Horton & Co., the bill charges that many of the "accounts are practically worthless and it will be impossible *for your orator to collect* (italics supplied) more than ten or fifteen per cent. of them." Other allegations of the bill are to the same effect, and apparently the case proceeded in the trial court on this theory. The bill charged that the personal estate was insufficient to pay the decedent's debts, and, after setting out the real estate of which intestate died seized and possessed, prayed for a sale thereof or so much thereof as might be necessary to pay the debts. Not only so, but "he asks that *he* be allowed to make either private or public sale of the same as in *his* judgment is most advantageous to the estate of his decedent, and will best conserve the interests of his widow, the said S. A. Horton, and his credi-

tors." (Italics supplied.) No such bill could be maintained by the administrator of W. H. Horton. The administrator has nothing to do with the land, except to collect the rents accrued during the lifetime of the decedent, and he has no capacity to bring a suit to sell it. His concern is solely with the personal estate which it is his duty to administer. If that is not sufficient to pay the debts of the intestate, it is no concern of his administrator. The creditors have their remedy against the heirs to subject the real estate which is made assets for the payment of their debts by section 2665 of the Code, but the administrator has no such right. The real assets are not subject to be administered at the suit of the administrator of an intestate, in the absence of a statute conferring such right. In this State, the right to subject the real assets is expressly given to the creditor. It is not extended to the administrator of the intestate. Code, section 2668. Hence, the bill cannot be maintained by the administrator. *Brewis* v. *Lawson*, 76 Va. 41; *Litterall* v. *Jackson*, 80 Va. 604; *Pierce* v. *Jackson*, 85 Va. 227, 235, 7 S. E. 189. Furthermore, if the bill be regarded as a bill by the administrator of W. H. Horton, it is without equity to support it, and whenever it is brought to the attention of a court of equity, or it discovers that a bill does not state a case proper for relief in equity, it will dismiss it, though no objection was taken to the jurisdiction by the defendant in his pleadings. The want of equity is the want of jurisdiction in such case, and though the defendant took no notice of the defect but defended on the merits, and the case was heard and decided on the merits, this court will reverse and dismiss where there is such lack of jurisdiction. *Morgan* v. *Carson*, 7 Leigh (34 Va.) 238; *Hudson* v. *Kline*, 9 Gratt. (50 Va.) 379, 386. There are other objections to the bill, treated as a bill by the administrator, but we have stated sufficient.

If the bill be regarded as a bill filed by Bostic, in his in-

dividual capacity and as a creditor of W. H. Horton, it is also subject to serious objection. If a bill be filed by a general creditor of a decedent for the purpose of subjecting his real as well as his personal estate, not only are the heirs necessary parties defendants, but the personal representatives also. *Johnston* v. *Pearson,* 121 Va. 453, 93 S. E. 640. In the case at bar, the complainant was the personal representative of W. H. Horton, but he is not brought before the court in that capacity. The widow of Horton was entitled to dower in his real estate, and she and W. H. Horton constituted the firm of S. A. Horton & Co., whose assets were sought to be subjected in the suit. She was therefore a necessary party as such surviving partner, and also in her individual capacity, as the bill asked for a sale of the land of which she was to be endowed. The decree complained of states that "S. A. Horton is a proper party to this suit; she is a party thereto and has been duly served with process." There is every presumption that this statement of the decree is correct, but we have been unable to verify it from the record before us. The complainant attempted to make all creditors of W. H. Horton and of the firm of S. A. Horton & Co. parties defendant, but several of them were not served with process. This was immaterial as such creditors were not necessary parties. The children of M. D. Horton, who was a brother of W. H. Horton, were entitled to a share in the latter's estate. Their names were given at or near the commencement of the bill, and they are asked to be made defendants in the prayer, and that a guardian *ad litem* be appointed for them in the following language: " * * * and the following children of M. D. Horton, all of whom are infants under the age of twenty-one years, and for whom a guardian *ad litem* is prayed to be appointed," but no names are given, no process was served on them, no guardian *ad litem* appointed, and no answer filed by or for them. This was manifest error, and their inter-

ests are unaffected by any proceedings in the cause. *Turner* v. *Barraud,* 102 Va. 324, 46 S. E. 318. The bill nowhere directly alleges that W. H. Horton, or anyone else is indebted to the complainant, or that he is seeking to enforce a liability of any kind against anyone, but on examination we find in the lists of creditors filed and also enumerated in the bill that the complainant or some one of the same name, holds a claim against the estate of W. H. Horton, amounting to $26.00, and a claim against S. A. Horton & Co. amounting to $16.80. There is nothing in the bill, or in the evidence, save this identity of names, to show that the complainant in his individual capacity, has or is asserting any demand against the estate of W. H. Horton or the firm of S. A. Horton & Co., nor is there any prayer in the bill that these or any other debts be paid out of any particular assets, or that they be paid at all, unless the prayer for general relief be sufficient for that purpose. There was no appearance for any of the defendants, except Nelson Horton, who demurred to the bill, and also answered denying many of its material allegations. The demurrer was in writing, but did not state the grounds thereof. Appellees insist that it is of no value because the grounds were not stated. In this they are in error. Grounds of demurrer need not be stated unless required by some "party thereto" or by the court. In this case they were not called for. Code, section 3271.

Notwithstanding these defects, the trial court proceeded with the case without any objection on the part of anyone, except the demurrer aforesaid. The case was referred to a master to take, state and settle the accounts of D. H. Bostic as the administrator of W. H. Horton, deceased, to ascertain and report the debts against the estate of the said W. H. Horton and S. A. Horton & Co., to ascertain and report what real estate W. H. Horton died possessed of, and where located, what real estate is owned by S. A. Horton & Co.

liable to the debts of said S. A. Horton & Co., and any other matter deemed pertinent by the master, or required by any of the parties. While the case was pending before the master, there developed the controversy which gave rise to the present appeals.

J. H. Catron laid before the master four negotiable notes for $1,000 each, made by W. H. Horton, payable to Nelson P. Horton, endorsed in blank by him and his wife, Ibbie Horton, and of which Catron claimed to be the *bona fide* holder in due course, and which he asked to have allowed to him as a debt against the estate of W. H. Horton. The allowance of this claim was vigorously resisted by the administrator of W. H. Horton and by his creditors, who employed separate counsel. This was the only matter contested in the suit. While the case was pending before the master, S. A. Horton gave her deposition in which she stated that she was only a nominal partner in the firm of S. A. Horton & Co., and that all of the business and assets of the firm really belonged to her husband, W. H. Horton. All of the personal assets of the firm were taken over and reduced to cash by Bostic as administrator of W. H. Horton, without objection from any source. The master stated and reported to the court an account between D. H. Bostic, administrator of W. H. Horton, and the firm of S. A. Horton & Co.; an account of the transactions of Bostic as administrator of W. H. Horton; an account of debts against the firm of S. A. Horton & Co.; an account of debts against W. H. Horton; a statement of the real estate whereof W. H. Horton died posessed; and a statement of the real estate whereof S. A. Horton was possessed. As to debts against W. H. Horton, deceased, the master reported in favor of Catron, but, on exceptions to his report, the claim was disallowed and rejected, and from this decree separate appeals were allowed to Nelson P. Horton and J. H. Catron.

Notwithstanding all the defects and irregularities here-

inbefore pointed out, the bill must be regarded as a creditor's bill by Bostic to settle up the estate of W. H. Horton and subject his personal and real estate to the payment of his debts, and although Bostic as administrator of W. H. Horton was not before the court, his absence will be deemed to have been waived by the parties, and the master's report of the transactions of D. H. Bostic as administrator of W. H. Horton and in connection with assets of S. A. Horton & Co., will be accepted as an agreed statement of the correctness of those accounts, as no objection thereto or to other irregularities was interposed either in the trial court or in this court. The Catron debt has been fully investigated, and the parties have had a full and fair hearing on the merits. They are not now making any objection to defect of parties, or irregularities in the procedure, and as such defects and irregularities do not affect the jurisdiction of the court or the ability of the court to do justice between the parties to this controversy, they will not be noticed by the court, and will be deemed to have been waived.

In July, 1912, Nelson P. Horton killed his nephew, Charles Horton, and in the same altercation unintentionally killed his brother, M. D. Horton, generally spoken of by the witnesses as "Mack Horton." The altercation took place in the State of Tennessee, where the parties then resided. He was tried and acquited for killing his nephew, but for the killing of his brother he was found guilty of involuntary manslaughter and sentenced to confinement in the penitentiary of Tennessee for a period of one year. The case was appealed, but the judgment of the trial court was affirmed and he was sent to the penitentiary in November, 1913. At this time Nelson P. Horton owned a farm of 160 acres, upon which he resided, in Hancock county, Tennessee. At the same time his brother, W. H. Horton, was engaged in the mercantile business with his wife, under the style of S. A. Horton & Co., at Big Stone Gap, Virginia.

After the killing, but before the trial of Nelson P. Horton, it is claimed by Nelson that he negotiated a sale of his farm to W. H. Horton at the price of $6,000, but the deed was not made until after his trial and conviction. He claims that $2,000 of the purchase money was to be paid in cash, and that four notes were to be given of $1,000 each, payable two years after date, with interest at six per cent., and that these notes were to be paid by the sale to him of the business of S. A. Horton & Co. at Big Stone Gap. Three negotiable notes of $1,000 each were executed and delivered by W. H. Horton, each dated November 20, 1912, payable two years after date. It is claimed that the fourth note was not given at that time because they had only three blank notes, but the fourth note for $1,000 was afterwards executed, bearing date November 17, 1913, payable one year after date, with interest. It was at one time claimed that this fourth note was a forgery, but this claim was subsequently abandoned. The notes were all negotiable. They were endorsed and delivered by Nelson P. Horton, without consideration, to his wife, Ibbie Horton, and it is claimed by Catron and Nelson P. Horton that Ibbie Horton, subsequently and before the maturity of said notes, for the consideration of $3,200, endorsed and delivered all four of said notes to Catron, who is a *bona fide* holder thereof for value in due course, and is entitled to collect the same. The sale of the stock of S. A. Horton & Co. to discharge said notes it is alleged did not take place on account of the death of W. H. Horton in March, 1914, while Nelson was still in the penitentiary. The present suit was brought in June, 1914. The answer of N. P. Horton was filed and the decree for the account entered at the October term, 1914, of the court, and the transfer of the notes to Catron was made somewhere between the 14th and 20th of November, 1914. On the other hand it is claimed by the administrator and the creditors of W. H. Horton that this whole transaction was

a mere sham and a device on the part of Nelson P. Horton to defeat his creditors, and that W. H. Horton participated therein; that Nelson feared suits for damages by the widows of the two men he had killed, and that this device was resorted to by him and W. H. Horton "to save Nelson from being broke up;" that Catron had .both constructive and actual notice of the pendency of this suit, and that he was not a *bona fide* holder in due course, and could not recover on said notes. The deed from Nelson P. Horton to W. H. Horton expressed the consideration as "$4,000 cash in hand paid, the receipt of which is hereby acknowledged." The bill does not expressly charge any fraud in the transaction, but does allege that $4,000 was the true consideration of the deed; that Nelson P. held the notes of his brother for $3,000; that the latter had mortgaged the land for $2,000 to a bank at Rogersville, Tenn., which had been turned over to Nelson P. by his brother, and that the $3,-000 of notes held by Nelson P. should be credited by the $2,000 paid thereon as aforesaid. The findings of the master on these questions were as follows:

"1. That the purchase price of said tract of land was $6,000, represented by the said four notes of $1,000 each, and the said $2,000 note of N. P. Horton, which was to be assumed and paid by W. H. Horton.

"2. That the note for $1,000 bearing date of November 17, 1913, was signed by W. H. Horton, and that the signature is genuine.

"3. That the conveyance of the said tract of land was made with the intent for the purpose of evading and hindering the collection of damage claims by Mrs. Charlie Horton and Mrs. Mack Horton against N. P. Horton for the killing of their respective husbands, actions for which the said N. P. Horton expected to be instituted against him.

"4. That W. H. Horton had knowledge of and participated in the said intent and purpose of N. P. Horton in the conveyance of said tract of land.

"5. That the notes were assigned by N. P. Horton to Ibbie B. Horton, his wife, without consideration.

"6. That the circumstances attending the negotiations between N. P. Horton and his wife and J. H. Catron for the purchase of said notes by J. H. Catron should have aroused the suspicions of said Catron; that the undersigned is not satisfied that he made such inquiry into the circumstances of the conveyance of said tract of land as it was his duty to do, and that he is affected with notice of any infirmities that may exist in the said notes by reason of the character of the conveyance of said land by N. P. Horton to W. H. Horton. However, the undersigned is of the opinion that it would not be competent for W. H. Horton, if he were living, to avoid the payment of these notes on the ground that they were executed for the purchase price of land conveyed to him in fraud of N. P. Horton's creditors; that the policy of the law to discourage transactions of such character would be best subserved by compelling W. H. Horton to pay these notes; and the undersigned is of the opinion that the estate of W. H. Horton, and the creditors thereof, stand in his shoes with respect to such defense against the notes in question. For this reason, the undersigned has allowed this debt."

Sundry exceptions were filed to the master's report, but they are quite lengthy and need not be set out in full, as the ruling of the trial court thereon will sufficiently disclose their purport. The trial court held that the sale of the land by Nelson P. Horton to W. H. Horton was "a fraudulent transaction," made with intent to defraud and deceive "both the then existing and prospective creditors of the said N. P. Horton," and *the said W. H. Horton and S. A. Horton & Co.*, and that the latter have the right to contest the payment of said notes in this suit. Nelson P. Horton owed comparatively few debts at the time, but the evidence tends strongly to prove that he was apprehensive about

these damage suits, and that the transaction was intended to defeat any judgment that might be recovered on that account. Indeed, all the testimony on behalf of the administrator and creditors of W. H. Horton was directed to this point. The record contains no evidence of an intention on the part of W. H. Horton to defraud his individual creditors or the creditors of S. A. Horton & Co. While the testimony as to the intent to defraud the creditors of Nelson P. Horton is conflicting, we may assume for our present purposes that such intent existed, and was sought to be carried out by the sale aforesaid. This did not render the transaction void, but voidable only. It was valid between the parties and neither could undo it without the consent of the other, nor would the courts lend their aid to either in undoing it; but it was void as to the creditors of Nelson P. Horton. See sections 2458 and 2472 of the Code. The instant case is very similar, in some of its aspects, to the case of *Harris* v. *Harris' Ex'r*, 23 Gratt. (64 Va.) 737. In that case, a young man who had been an impressing officer of the Confederate government, shortly after the war, was apprehensive of the results of suits which had been brought against him, and of the recovery of damages for acts done by him during the war as such officer. In order to defeat such recovery, he executed a number of bonds to his father for large amounts under an agreement between them that if no trouble arose from this quarter the father would redeliver the bonds to the son. No such trouble did arise, but the father died in possession of the bonds, and suit was brought thereon by his executor. The son sought to set up the agreement aforesaid in bar of recovery, but this court held that the bonds were valid obligations, as between the parties, and applying the maxim, *nemo allegans suam turpitudinem est audiendus,* refused to permit the defense. It was further held that the contract was not void *ab initio.* It was void only as to third persons, and the law, upon

grounds of public policy, makes it valid between the parties. So, in the case in judgment, the transaction was valid between the parties and the law will not lend its aid to either, but will leave the parties where it found them. As to creditors of Nelson Horton, however, the transaction is void as it was made to hinder, delay and defraud them. But this is not true of the creditors of W. H. Horton. Evidence of an intent to defraud the creditors of Nelson P. Horton is not evidence of an intent to defraud the creditors of W. H. Horton, or of S. A. Horton & Co. Quite the contrary. Apparently, W. H. Horton, and thereby indirectly his creditors, was to be benefited at the expense of the creditors of Nelson P. Horton, and that is the theory of the evidence offered. If there was no evidence of an intent on the part of W. H. Horton to hinder, delay or defraud his creditors (and there was none) they cannot assail the transaction even though he made a bad bargain and agreed to pay more for the land that it is worth. In the absence of fraud, unsecured creditors cannot question the contracts of their debtors and undo all that is not beneficial to them.

It is true that section 2458 declares that contracts like the one under consideration shall, "as to such creditors, purchasers or other persons" be void, but as was said in *Ratliff* v. *Ratliff*, 102 Va. 880, 885, 47 S. E. 1007, 1009: "this section, as well as the unvarying decisions of this court, however, declare that, as between the parties, such a writing shall be binding and valid." The statute does not expressly declare that the contract shall be valid between the parties, but it does so declare by necessary implication when it names the classes of persons who may assail it. The expression of one was the exclusion of the others. Neither W. H. Horton nor his administrator could avoid the transaction. It was not void *ab initio*, and section 2458 of the Code, as we have seen, declares who may avoid it. Amongst others who may avoid the transaction are "credi-

47

tors," but whose creditors? This question is answered by
section 2472 of the Code, which appears in the same chap-
ter with section 2458. It is there declared that "the word
'creditors,' where used in any previous section of this chap-
ter, shall not be restricted to the protection of creditors of
* * * the grantor, but shall extend to and embrace all
creditors * * * who but for the deed or writing would have
had * * * a right to subject it to their debts." In the in-
stant case, if no deed had been made by Nelson P. Horton
to W. H. Horton, the creditors of the latter would clearly
have had no pretense of a right to subject the lands of
Nelson P. to the payment of their debts, and hence are not
within the terms of the statute. It seems equally clear that
the "other persons" mentioned in the statute must have
been likewise prejudiced before they could assail the trans-
action.

The language of Judge Staples in *Henderson* v. *Hunton,*
26 Gratt. (67 Va.) 926, 933, with reference to deeds void
*ab initio,* quoted by counsel for the appellees, was used in
a case in which no such deed was in controversy, and is
inapplicable to a case of this kind. Furthermore, it is mani-
fest that Judge Staples could never have intended the lan-
guage used in *Henderson* v. *Hunton* to apply to a case of
this kind, as he was a member of the court and concurred
in the opinion in *Harris* v. *Harris' Ex'r, supra,* holding
transactions of this nature good between the parties and
not void *ab initio.*

It would render this opinion too long to cite authorities
on this subject from other States. The law is well stated,
and authorities cited in the notes in 12 Ruling Case Law,
section 7, page 473, as follows: "The wording of the statutes
13 and 27 Elizabeth, and of nearly all those patterned after
them in this country, is that the conveyances prohibited
shall be 'utterly void.' The literal meaning of the language
used would render the covinous deed void, not only as to

the persons intended to be defrauded, but also as to strangers, and even the grantor himself. But the unanimous verdict of the decisions is that a voluntary or a fraudulent conveyance is valid between the parties, and in fact as to the whole world, except those within the protection of the statutes, that is, the word 'void' in the statutes has been uniformly construed to mean 'voidable,' and 'voidable' only at the instance of those embraced within the meaning of the terms 'creditors and others' or 'purchasers.' Consequently the expression so often used, that a fraudulent transfer is void against creditors, simply means that the rights of creditors as such are not, with respect to the property, affected by the transfer; but that creditors may, notwithstanding the transfer, avail themselves of all the remedies for collecting their debts out of the property, or its avails, which the law has provided in their favor, and that in pursuing those remedies they may treat the property as though the transfer had not been made, that is, as the property of the debtor. The transfer is good, however, against even creditors, unless they protect themselves by pursuing that prescribed course by which alone the property can be made available for the satisfaction of debts." See also a very full note in 3 Am. St. Rep. 727-745.

If the contract between Nelson P. Horton and W. H. Horton for the sale of the Tennessee land was provisional only, and their agreement was that the notes given for deferred payments were to be paid *only* by the delivery of the stock of goods of S. A. Horton & Co. at Big Stone Gap, it may be that the notes could not have been asserted as debts against the general estate of W. H. Horton, deceased, had they been non-negotiable. But the notes were negotiable and transferred for value, in due course, before maturity. It is true that the notes were of the face value of $4,000, and were purchased for $3,200, but the holder testifies that he knew that Nelson Horton "needed money," and

he was apparently trying to get even a greater discount, although he says, "I thought the notes were worth one hundred cents to the dollar in gold when I bought them." This fact alone, of course, did not charge Catron with knowledge of equities inhering in the notes. Being a purchaser for value, before maturity, his holding was *prima facie bona fide,* and the burden was on the party denying the *bona fides* of the transaction to prove his case, as the law will not presume fraud. Of course, the evidence may be circumstantial, but the proof of the existing circumstances amounting to implied notice must be clear. *Andrews* v. *Fidelity Co.,* 103 Va. 196, 204, 48 S. E. 884. In the case in judgment, we do not regard the evidence sufficient to overcome the *prima facie* presumption of *bona fides* created by the purchase for value, in due course, before maturity. We do not question the correctness of our conclusion in *Andrews* v. *Fidelity Co., supra,* where actual notice was shown, and *Piedmont Bank* v. *Hatcher,* 94 Va. 229, 26 S. E. 505, where the holder of the paper was chargeable with notice of fraud in the inception of the paper. The circumstances proved in the latter case were very much stronger than in the case in judgment where the chief reliance is upon the testimony of interested parties as to alleged statements of Catron which he denies.

Our conclusion is that so much of the decree of the Circuit Court of Wise county as holds that the notes held by J. H. Catron, and proven in this case, are void and not enforceable against the estate of W. H. Horton, is erroneous. This conclusion renders it unnecessary to consider several other questions of interest discussed in the briefs of counsel.

Something was said in the testimony of some of the witnesses who testified in this case about one or more suits pending in Tennessee by creditors of Nelson P. Horton to set aside the deed made by him to W. H. Horton, and as to what had been done therein and the present status thereof; but such matters cannot be shown by such testimony. The records of the Tennessee court are the best evidences thereof.

As the case has to be remanded, there is another error in the decree to which attention is called so that it may be corrected. While S. A. Horton was at least an ostensible partner of the firm of S. A. Horton & Co., and as such liable for its debts, her individual real estate cannot be subjected thereto before the debts have been reduced to judgment, and it was error to decree a sale of such real estate to pay unsecured debts. Real estate of a debtor cannot be sold to pay his unsecured debts. A court of equity has no such power.

As the record before us does not furnish any evidence of the appointment of a guardian *ad litem* for the infant defendants, we supposed this would appear from the proceedings at the rules, and we requested the clerk of the Circuit Court of Wise county to furnish us with the proceedings at the rules. In reply to this request he says: "I cannot say just now just how the case was placed on the docket; the first decree states that the cause had properly matured at rules, although I cannot find any record." The proceedings at the rules are a part of the record of the court (Code, sections 3236, 3237), and where the interests of infants are concerned it must affirmatively appear from the record that a guardian *ad litem* was duly appointed. Where the record is silent on the subject, it will not be presumed. In the cases at bar, it does not appear from any proceedings at the rules, or from any decree in the cause, or otherwise, that any guardian *ad litem* was appointed for the infant defendants. See *Jeffries* v. *Jeffries, Ex'r,* 123 Va. 147, 96 S. E. 197; *Turner* v. *Barraud,* 102 Va. 324, 46 S. E. 318; *Alexander* v. *Davis,* 42 W. Va. 465, 26 S. E. 291; Burks' Pl. & Pr., section 192.

For the errors aforesaid, the decree of the Circuit Court of Wise county must be reversed, and, in order that the necessary parties may be brought before the court, and the

cause proceeded in more regularly, the said circuit court should require the complainant to amend his bill so as to make D. H. Bostic, administrator of W. H. Horton, deceased, S. A. Horton in her own right and as surviving partner of herself and W. H. Horton, late merchants and partners doing business under the style and firm name of S. A. Horton & Co., and the infant children (naming them) of M. D. Horton, parties defendants, and a proper guardian *ad litem* should be appointed for said infants. When the case is matured upon amended pleadings, a proper decree can then be made therein in conformity with this opinion.

*Reversed.*

SIMS, J., dissenting:

I agree with what is said in the majority opinion as to these causes being construed to be a creditors' suit; as to the further proceedings which should be had therein, with respect to parties; and with what is said in the majority opinion as to the necessity of the liability of S. A. Horton being reduced to judgment (or of some lien thereafter being fixed on her real estate), before such real estate can be decreed to be sold.

I also agree with the conclusion stated in the majority opinion that the deed from Nelson P. Horton to W. H. Horton, although fraudulent as to the creditors of the former, could not be set aside as fraudulent and void as against the creditors of the latter, because even if the property conveyed were within the jurisdiction of the court below there is an entire absence of proof in these causes of such fraudulent intent attending the execution of such deed.

But while this is true, I do not think it follows that the payment of the notes in question, given by W. H. Horton to Nelson P. Horton, for the deferred payments of purchase money for the land conveyed by said deed, can be enforced

against the estate of W. H. Horton to the detriment of others who are creditors of such estate. That question, I think, depends upon what was in fact the understanding and agreement between Nelson P. Horton and W. H. Horton at the time such notes were given as to the character and extent of the obligation of such notes.

These causes do not involve the setting aside of the deed aforesaid. The court below had no jurisdiction, indeed, so to do, the land conveyed being in another State. And they do not in any aspect, accurately speaking, involve the question whether said deed was or was not fraudulent and void *as against the creditors of W. H. Horton;* but the question does arise incidentially, whether such deed was or was not in fact, in accordance with the true intention of the parties thereto, a mere camouflage, a mere semblance of a sale and purchase which did not then in truth occur. The pivotal question is whether the said notes were intended by the parties thereto to be and were executed and delivered as the unconditional personal obligations of the said W. H. Horton.

The testimony in these causes, when read in the light of the circumstances which surrounded said brothers as disclosed by the record, clearly satisfies my mind that said notes were not intended by either of said brothers, when they were executed and delivered, to create unconditional personal obligations of W. H. Horton to Nelson P. Horton. It was clearly not then intended by either of them that such notes were ever to pass out of the hands of Nelson P. Horton, except to be returned to W. H. Horton. Nelson P. Horton himself states that the agreement between him and his said brother, when the notes were given, was that he (Nelson P. Horton) "* * * was buying the store," (of W. H. Horton), "was going to take charge of it;" and in answer to the question, "How were you to pay for it?" answered, "In those notes." (Record, page 129.) I think the pre-

ponderance of the evidence establishes that what W. H. Horton said to his wife in reference to the deed of trust which she was induced to execute, namely, "Mrs. Horton, it does not involve anything of ours," also characterizes the true nature of said notes in accordance with the mutual intention of both of said brothers when the notes were given, and that such intention continued so long as W. H. Horton was living (record, page 211). I think the testimony of Thos. L. Horton (record, page 77), Will Frazier (record, page 105), Nelson P. Horton (record, pages 128, 139), Hester Horton (record, page 169), and S. A. Horton (record, pages 206, 211), establishes by a preponderance of the evidence that, notwithstanding the execution and delivery of said deed, the real estate thereby conveyed, as between Nelson P. Horton and W. H. Horton, was still to be considered to be and was the property of Nelson P. Horton, and was intended to continue to remain his until such time as Nelson P. Horton should be liberated from his troubles in Tennessee. That it was agreed between the brothers that when so liberated Nelson P. Horton would come to Big Stone Gap and then buy the stock of goods of W. H. Horton there; and that, if W. H. Horton had not meanwhile sold said real estate for the benefit of Nelson P. Horton, the said W. H. Horton would then take said real estate in exchange for said stock of goods upon a purchase then to be made—the value of the stock of goods to be then ascertained by inventory of it (see Nelson P. Horton's statement as to inventory, page 129, record) ; and that in such case the notes aforesaid were to be delivered up to W. H. Horton by Nelson P. Horton. That purchase of the stock of goods and actual transfer of the ownership of said real estate never took place on account of the death of W. H. Horton.

That is to say, the said notes were not absolute but conditional obligations. The condition upon which they were

to become absolute was the subsequent purchase by Nelson P. Horton of said stock of goods. That condition was never performed.

Therefore, as between Nelson P. Horton and W. H. Horton, the said notes never were or became valid and binding obligations of the latter to the former. And since the creditors of W. H. Horton stand in his shoes, the same is true as to them, and such notes are not binding obligations against W. H. Horton's estate, unless made so by their having come into the hands of a *bona fide* holder thereof for value, unaffected with notice of their true character.

As to the latter question:

The notes were entrusted by W. H. Horton to the keeping of his said brother. The evidence shows clearly that the notes were so entrusted to Nelson P. Horton for the fraudulent purpose, it is true, of deceiving certain parties in the event that they should sue and obtain judgment or judgments against the latter. But those parties never sued or recovered such judgments, are not before the court in these causes, and the notes were not entrusted to Nelson P. Horton to be by him in any event sold or assigned to any one. It was practically a year after such notes were given him, and some eight months after the death of W. H. Horton, that Nelson P. Horton first conceived the purpose or design to sell the notes before maturity. W. H. Horton was no party to such purpose or design, and it was consummated by Nelson P. Horton in fraud of the rights of W. H. Horton, as fixed by the understanding between the two brothers aforesaid, and hence it would have been in fraud of W. H. Horton had he been then living, and, being after his death, was in fraud of the creditors of the latter. It was from such fraudulent transfer of said notes that the threatened injury to such creditors arises; not from their original execution and delivery to Nelson P. Horton, or from the execution and delivery of said deed. Had the latter kept

faith with his brother and retained such notes in his hands for such purpose only as that for which they were given, the controversy in these causes over their validity as obligations against the estate of W. H. Horton could never have arisen. That that purpose was fraudulent is therefore immaterial in these causes. And since W. H. Horton was not a party to such fraudulent transfer, no question of his being *in pari delicto* can properly arise or affect the question we have under consideration.

Now, upon the question whether the appellant, J. H. Catron, was a *bona fide* purchaser for value of said notes without notice of their true character:

It is not clear from the evidence whether one of the notes was or was not past due when bought by said Catron. But if we assume that none of them were past due when such purchase was made, yet they were bought after the death of W. H. Horton, when his estate was believed to be solvent, at such a large discount (being $800 on a total principal of $4,000, or one-fifth thereof), and under such other circumstances attending the negotiations for the purchase as should have aroused the suspicion of said Catron and put him upon inquiry; and, on well settled principles, Catron had constructive notice of the real character of and infirmity in the notes aforesaid, when he purchased them—as the commissioner in these causes in substance found by his report and as the decree complained of held. See Code, sec. 2841-a, subsec. 52, cl. 4; *Piedmont Bank* v. *Hatcher,* 94 Va. 229, 231, 26 S. E. 505; *Andrews* v. *Fidelity Co.,* 103 Va. 196, 204, 48 S. E. 884.

That the bill does not allege or tender the issue that said notes were not in fact valid personal obligations of W. H. Horton is immaterial, it being a general creditors' suit, since the practice is well established that creditors, whose debts are reported or asserted before a commissioner acting under a decree of reference for the ascertainment of debts, may

make defenses and obligations to other claims asserted as debts before the commissioner which are not made in the bill, and that such defenses and obligations do not require formal pleadings but may be put in issue by notice given during the taking of depositions, or before the commissioner or court, in any manner which is sufficient to substantially raise the issue before the commissioner or the court; and the issue may be raised before the court for the first time by an exception or exceptions to the commissioner's report. The latter was done by appellants, creditors of the estate of W. H. Horton, by their exceptions to the commissioner's report in these causes.

For the foregoing reasons, I am of opinion that there was no error in the decree complained of, in so far as it held that said notes are not enforceable against the estate of W. H. Horton, and to that extent, as I think, it should be affirmed.

For the foregoing reasons, I am constrained to dissent from the majority opinion.