# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

## LAMAR'S EX'OR v. HALE AND ALS.

July 17, 1884.

1. PURCHASERS FOR VALUE WITHOUT NOTICE—*Essentials to this defence.*— To maintain this defence alienees must aver and prove, (1), that they are purchasers for valuable consideration ; (2), that the consideration has been *actually paid ;* (3), that they have received, or are best entitled to receive conveyance of the property, and (4), that those essentials·all occurred prior to their having notice of the adverse claim.

2. IDEM—*Idem—Onus probandi.*—Burden of establishing first three essentials rests on alienees ; and to affect them with notice of his adverse claims, rests on claimant.

3. IDEM—*Charges—Caveat Emptor.*—Under doctrine of *caveat emptor* purchasers are as much affected by implied, as by express charges on the purchased property. *Downman* v. *Rust,* 6 Rand. 587.

4. IDEM—*Sufficient notice—Settled doctrine.*—Notice to affect purchasers for value with charges on property purchased, may be actual or constructive. Whatever suffices to put purchaser on an inquiry which should lead to discovery of charge, is constructive notice. *Wood* v. *Krebbs,* 30 Gratt. 715.

5. IDEM—*Confidential relations.*—Partners, agents and others in confidential relations, can acquire the property of the firm, &c., only for the benefit of the firm, &c ; and purchasers from them, charged with notice of the facts, occupy no better position than their vendors.

6. MINING PARTNERSHIPS—*Their peculiarities.*—The distinctive feature of such partnerships is the absence of the " *dilectus personarum,*" which characterizes ordinary partnerships, Dissolution is not the *ipso facto* result of the transfer of one member's share to another person. Hence its membership is changeable and uncertain. Only the parties are affected by decrees and judgments against it. All persons dealing with it are bound to take notice of its peculiarities.

7. DECREES AND JUDGMENTS—*When not conclusive.*—All presumptions must be made in favor of the jurisdiction of courts of general jurisdiction. But when record shows want of jurisdiction over a given person, the judgment or decree affects not such person.

8. IDEM—*Conditional.*—Claimant under decree on its face inoperative till performance of certain acts, must show such performance in order to entitle him to benefit of such decree.

9. STATUTES OF LIMITATION—*Adversary possession.*—Proof of adversary possession is essential as foundation for plea of bar arising from statutes of limitation.

10. IDEM—*Fiduciaries.*—Statutes of limitation have no application to persons acting as trustees whether regularly appointed or not.

11. EQUITABLE BAR—*Acquiescence and Laches.*—Neither acquiescence nor *laches* can justly be charged in the absence of knowledge of the facts whereon it is predicated; and both depend on the circumstances of each particular case. *Rowe* v. *Bentley,* 29 Gratt. 763.

Appeal from decree of circuit court of Carroll county, rendered October 18th, 1880, in suit of G. D. Lamar, executor and legatee of G. B. Lamar, deceased, complainant, against Fielden L. Hale, Norman Hale, Garland Hale, Samuel S. Clayton, James E. Clayton, James E. Tyson and others, defendants, instituted in 1877. Its history is this:

In 1854 a mining partnership was formed for dealing in copper-mining rights and lands in Carroll and other counties in Virginia, under the style of the "Meig's County, Tennessee and Virginia Mining Company." The company was never incorporated. Its members were numerous, and all non-residents of Virginia, except F. L. Hale and two others. It acquired lands in Floyd and Carroll counties, which were treated as real estate throughout. The company chose for its first president John G. Stuart, and afterwards he was succeeded by Joseph McCorkle as president. The company having organized, employed F. L. Hale as manager, under the style of "treasurer, secretary and general superintendent." The right was conceded to each member to dispose of his share so as to place purchasers in the same relation to the company as the sellers occupied. So the member ship was changeable and uncertain. At general meetings the

company could make assessments on members, and cause the manager to collect them. The articles were in writing and on record. Minutes of proceedings at general meetings were regularly kept and accessible to all. Prior to July, 1856, G. B. Lamar, then a merchant at Savannah, Georgia, had acquired two and three quarter shares out of the entire nineteen, and F. L. Hale six and a half shares. The said Lamar paid for his shares nearly $20,000 cash. The deeds conveying them to him he sent to F. L. Hale, the superintendent, at Hillsville, duly certified, for recordation in the proper counties. Hale received and kept the deeds, did not have them recorded, nor notify Lamar of his failure to have them put on record. When called on by F. L. Hale, before the war, Lamar made remittances to pay the company's assessments against him to the amount, as is claimed, of $2,000, and as admitted of $600. At general meetings held at Hillsville, on the 9th and 10th of October, 1856, as the minutes show, Lamar was present (by proxy) as a shareholder, and took part in the proceedings. The minutes also show that Thomas B. Henly was then also present as a shareholder, and that F. L. Hale acted as secretary. The minutes of the meeting, held at the same place on the 19th day of May, 1857, show that Thomas W. Carter had been acting as clerk of the company's store, and was ordered to close it up.

A letter from F. L. Hale, dated "Hillsville, Va., 9th January, 1859," to G. B. Lamar, calling for $600 to pay for one share of the Nowlin purchase of copper lands in Floyd county, is in the record. This sum was remitted. Stress of business at home and troubles growing out of the war diverted Lamar's attention from these matters until 1873, when he died in New York, leaving a will, by which he appointed his son, G. D. Lamar, his executor, and bequeathed his property to his children. The executor duly qualified, and turning his attention to this mining interest, found all the visible property of the company in the possession of persons claiming same in exclusion of himself, as alienees, immediately or mediately, of F. L. Hale, except the

"Toncray property," in Floyd county, which, though claimed by an alienee of F. L. Hale, was in the possession of the company's co-tenants claiming adversely. Thereupon this suit was brought against F. L. Hale, his alienees and others, to obtain a discovery of the deeds and other papers entrusted to F. L. Hale, to settle his account as general superintendent, to have all necessary accounts taken of the company's assets, to dissolve the company, and to distribute its assets as the results might show to be right and proper.

To the bill setting forth these facts in detail, a demurrer was filed and overruled.

John Early filed his answer, of which nothing need be said, as in respect to him no error in the decree complained of is assigned. Answers were also filed by F. L. Hale, S. S. Clayton, J. E. Clayton, J. E. Tyson, and Norman Hale. F. L. Hale admitted receiving the deeds sent him by Lamar to be recorded, and offered excuses for failing to record them, claiming that before receiving the deeds, but with full knowledge of Lamar's ownership of the shares, he had purchased all the company's property for $9,000, at a sale made in April, 1859, under a decree of the county court of Carroll, in the suit of Thomas W. Carter against the company, which sum he had paid and had received a conveyance from the court's commissioner; that the property was afterwards sold under decrees of court and a deed of trust for the benefit of his own creditors; that he had no longer any interest therein, and that nearly all the papers in that suit had been destroyed. But he filed a copy of the conveyance and two decrees, one entered January, 1859, ordering James S. Tipton, as special commissioner, to sell the interest of the company in the real estate mentioned in the bill in said Carter suit; the other entered July, 1859, confirming the report of sale made by the commissioner, and ordering him to collect the bonds for the purchase money, pay the costs of the suit and the judgment of the plaintiff, and the balance, if any, to the company; but providing that, *before acting under the decree,*

Tipton, the commissioner, should give bond in the penalty of
$18,000, payable and conditioned according to law, and directing
him, upon receipt of the money, to convey the property to the
purchaser, and report his proceedings to the court. The deed,
on its face, purports to have been made on the 4th day of Octo-
ber, 1867, by and between James S. Tipton, acting as commis-
sioner of the county court of Carroll county in the suit of said
Carter against the "Meigs County, Tennessee and Virginia
Mining Company" of the first, and F. L. Hale of the second
part, and recites that F. L. Hale, the purchaser, had fully
paid the purchase money, and was entitled to a deed, and that,
therefore, he, the commissioner, granted to F. L. Hale all the
interest, right and title of the said company, and *of the mem-
bers thereof*, described in the several deeds whereby they were
respectively conveyed to John G. Stuart, president of said com-
pany, which deeds are incorporated therein as if literally in-
serted. This deed does not recite, nor does it anywhere appear
that the commissioner had given the required bond, nor reported
the making of the deed, nor that his action had been confirmed
by the court, nor that the purchase money had been paid to the
plaintiff, Carter, or to any one for him.

There are, in this case, transcripts of the record of two actions
of debt in said county court by said Carter against "F. L. Hale,
superintendent of the Meigs County, Tennessee and Virginia
Mining Company," wherein judgments were rendered June 9th,
1858, for $7,614.41 and for $110.25, "the debts in the declara-
tions demanded," with interest from 27th November, 1857, and
from 3d February, 1858, respectively, till paid, and costs. The
answer and the depositions of F. L. Hale show that it was to
satisfy these judgments against Hale, out of the real estate of
the company, that Carter's said chancery suit was instituted.
The memorandum for the latter suit is all that survives of the
papers of that suit, except the two decrees, the records of the two
actions of debt and the deed of conveyance to F. L. Hale. The
memorandum is as follows:

"Thomas W. Carter *v.* Joseph McCorkle, A. W. Hodge, John H. Martin, Jesse Martin, James M. Martin, Orville Rice, John G. Stuart, A. V. Brown, V. K. Stevenson, John H. Martin and James M. Martin, executors of the last will and testament of Josiah Martin, deceased, F. L. Hale, surviving partners of themselves and H. H. Stephens, deceased, who were partners engaged in the copper mining company business, under the firm and style of 'Meigs County, Tennessee and Virginia Mining Company,' —— Stephens, heirs at law of H. H. Stephens, deceased, —— Nowlins, heirs at law of Matthew B. Nowlin, deceased, Thomas Blair, Lorenzo D. Blair, Elijah Sutphin, John Sutphin, Robert L. Toncray, Robert C. Carter, and John A. Carter, in their own right and as executors of the last will and testament of George Carter deceased, Walter C. Carter and William Carter  *Spa.* in chancery to October rules.

The object of this suit is to subject certain real estate in the bill mentioned to the satisfaction of a judgment lien of the plaintiff against the 'Meigs County, Tennessee and Virginia Mining Company.'

"The foregoing is a true copy of a memorandum made in the 'memorandum-book' of the county court of Carroll county, in September, 1858.

"W. H. SUTHERLAND, *Clerk.*"

The name of G. B. Lamar does not appear in the memorandum, and he was not a party to the suit. There is no evidence of the contents of any part of the lost record, except that F. L. Hale deposed that the company owed the debts for which said judgments were obtained, to satisfy which Carter brought his said chancery suit.

The Claytons and Tyson answering, say that part of the property purchased of F. L. Hale under the decree in the Carter suit in 1859, was subsequently sold under a decree of the circuit court of Carroll in 1872, in the suit of Wm. Nunn against F. L. Hale and others, to G. Hale, who sold same to them, and in 1873

united with said commissioner in conveying it to them, and that their deed was then duly recorded; that they are in the exclusive possession thereof as purchasers for value without notice of any claim whatever of G. B. Lamar ; that they are also in possession of the "Toncray property," in Floyd county ; that their title thereto is complete and was not derived immediately or mediately from F. L. Hale, but from Robert L. Toncray, through two intermediates; that they hold the same adversely to the said company and all its members, who claim one-half of it under a paper dated February 10th, 1854 ; that in a suit brought by Thomas B. Henley, a member and creditor of said company, against the company, to subject one-half thereof to satisfy his debt, the circuit court of Floyd county decreed that one-half belonged to the company, but that they had appealed, and that the appeal was then pending, undetermined, in the court of appeals. Here it is proper to state that that appeal has been passed upon and the decree affirmed. See *Clayton and Tyson* v. *Henley*, 32 Gratt. 65. And Norman Hale answering, said that he was in possession of two-thirds of the Weddle and Nowlin mines, which the company formerly owned, but which was sold and conveyed to F. L. Hale in 1859, under a decree in the Carter suit ; that F. L. Hale having long been in notorious and exclusive possession thereof, in November, 1872, conveyed the same to Garland Hale, as trustee, in trust to secure the payment of certain *bona fide* debts; that in execution of the trust said trustee sold the property, and he (Norman Hale) became the purchaser thereof at the price of $1,000, and that he "having fully arranged the purchase price thereof," the trustee conveyed the same to him by deed, which was duly recorded in 1873, and that he is a purchaser thereof for value, without notice of any claim of G. B. Lamar. The deed to Norman Hale is not in the record. F. L. Hale deposed that his "understanding from the parties, Eli C. Hale and Martin Hale, was that Norman Hale had settled the amount of the purchase money of the land."

The respondents all relied on the statute of limitations as a

bar to the claims of the appellant, and also on *laches* and acquiescence, and likewise on the adversary tenancy in themselves as excluding the jurisdiction of a court of equity.

The cause came on to hearing in October, 1880, when the circuit court entered a decree dismissing the bill with costs as to the defendants, John Early, S. S. Clayton, J. E. Clayton, J. E. Tyson, Garland Hale and Norman Hale, but being of opinion that the complainant was entitled to a decree for a settlement of the partnership transactions of the "Meigs County, Tennessee and Virginia Mining Company" between the partners, retained the cause, in order that a decree to that end might be entered if desired. From that decree G. D. Lamar, as executor and legatee of G. B. Lamar, obtained an appeal to this court.

*J. W. Caldwell, W. H. Bolling,* for the appellant.

*James A. Walker, J. L. Tompkins,* for the appellees.

RICHARDSON, J., after stating the case, delivered the opinion of the court:

The record shows, and in fact the decree complained of concedes that *the mining partnership* formed in 1854, and known as the "Meigs County, Tennessee and Virginia Mining Company," owned the several copper lands and mineral rights in the bill mentioned, and that the complainant's testator, G. B. Lamar, deceased, regularly acquired several shares in the property of the company, and was recognized as a shareholder, and as such participated by proxy in at least two general meetings of the members in October, 1856, and paid by remittance to F. L. Hale, holder of six and a half shares, and the general superintendent of the company, resident at the scene of operations, and agent for his non-resident partners, of whom G. B. Lamar was one, the amounts assessed against him by the company. For seemingly sufficient reasons, Lamar's attention was

diverted from these mining concerns from about 1859, when he made his last remittance, until 1873, when he died. His son, legatee and executor, G. D. Lamar, found in 1877 all the visible property of the company in the possession, exclusively of himself, of persons claiming as mediate or immediate alienees of F. L. Hale, the company's general superintendent and resident agent. Said executor and legatee then instituted this suit to discover certain deeds and papers, to settle the accounts of the superintendent, and of the partnership, to dissolve it and to distribute the assets. The alienees aforesaid defended on the grounds : First, that they are purchasers for value without notice of any equities of G. B. Lamar ; second, that G. B. Lamar's claims are barred by the statute of limitations, or by acquiescence and *laches*; and third, that their adversary tenancy excluded the jurisdiction of a court of equity. This last defence applying only to the " Toncray property."

These defences, if established, are certainly valid. The inquiry then arises, are all or any one of them sustained by the record ? 1st. To maintain the first named defence it is essential that the alienees aver and that it appear that they are: (1), purchasers for a valuable consideration; (2), that the consideration has been *actually paid ;* (3), that they have received, or are best entitled to receive a conveyance of the property; and, lastly, that these three essentials have all occurred prior to their having had notice of G. B. Lamar's claims upon the property in question. The burden of establishing the first three is on the alienees. The *onus* of affecting them with notice of his claims is on Lamar. That these alienees were, in a certain sense, all purchasers and received conveyances, is not denied; nor is it denied that the alienees, S. S. Clayton, J. E. Clayton, and J. E. Tyson, paid in full the stipulated price for the property so acquired by them. Not so, however, as to the remaining alienee, Norman Hale. In his answer, he says that he is in possession of two-thirds of the Weddle and Nowlin mines, formerly owned by the company, and purchased by F. L. Hale at the sale made

under the decree in the Carter suit in 1859, and conveyed in 1872 by F. L. Hale in trust to secure debts due by him, and by the trustee sold for $1,000, and conveyed in 1873 to him (Norman Hale) by deed recorded, and that he "had fully arranged the purchase money," and was a complete purchaser for value without notice of G. B. Lamar's claims. The only evidence in explanation or support of this averment is the hearsay statement of F. L. Hale that his "understanding from the parties, Eli C. Hale and Martin Hale, was that Norman Hale had settled the amount of the purchase money." Now, it is manifest that this alienee had it in his power, and the burden was on him, to prove *actual payment*, affirmatively, either by the trustee, who was Garland Hale, or by himself, had such actual payment occurred. He did not do so. The fair inference is that there was no such actual payment, and that the language "had fully arranged the purchase money" was deliberately employed with reference to what that phrase clearly imports; that is, not actual payment, but some arrangement or agreement short of actual payment. Now, will any arrangement short of actual payment of the purchase money suffice to constitute a complete purchaser under the circumstances of this case?

"The allegation that one is such a purchaser, must aver a conveyance and not merely a contract to convey; and a valuable consideration, and *actual payment* thereof, and not merely that it is *secured to be paid.*" 2 Minor's Inst. 877, and authorities there cited, viz: *Doswell* v. *Buchanan's Ex'ors*, 3 Leigh, 381; *Mut. Assur. Soc.* v. *Stone and al.*, 3 Leigh, 235 : *Tourville* v. *Naish*, 3 P. Wms. 307; *Wigg* v. *Wigg*, 1 Atkyns. 384, which abundantly sustain that able and accurate text writer, when taken in connection with the qualification of the general doctrine, as laid down by Mr. Minor on the page following that above quoted from, namely, that "where the first purchaser has not the legal title, and the subsequent one has *paid his money*, and has not, indeed, the legal title, but the *best right to call for the legal title*, before he receives notice, he shall be entitled to

priority, notwithstanding he has not actually acquired such title."

The doctrine that *actual payment* must be averred and proved in such case, is also laid down in Perry on Trusts, § 219, in these words: " The defendant in a suit in equity must clearly and unequivocally swear in his answer that he is a purchaser for value without notice, and he must set forth all the particulars of the purchase, and the title or the pretended title of the person from whom he purchased. He must show an actual conveyance and not merely an agreement for a conveyance; and it must be shown that the consideration money named in the deed was paid in good faith. It is not enough that the consideration was secured to be paid; nor is a recital of payment in the deed sufficient; there must be actual payment."

The conclusion then is that Norman Hale was not a complete purchaser of the two-thirds of the Weddle and Nowlin mines. His claim thereto is inferior to that of Lamar, because subsequent in point of time. His defence on such ground is untenable.

But the inquiry recurs, whether or not the title of F. L. Hale to the property acquired by him under the decree in the suit of Carter against McCorkle, F. L. Hale and others, survivors of the firm, composed of themselves and others, doing business under the name and style of the " Meigs County, Tennessee and Virginia Mining Company," and conveyed to him by special commissioner Tipton by the deed dated October, 1867, was a valid title, free from certain equities in favor of G. B. Lamar and the other members of the company; and if invalid and encumbered with those equities, whether or not such invalidity and encumbrance affect the title of F. L. Hale's alienees.

F. L. Hale's purchase was of property belonging to a *mining partnership*, of which he was a member, and in a relation to his associates of especial trust and confidence. He was at the scene of operations; they were absent, and confiding in him, the superintendent of the company's business, and official guar-

dian of their interests. In equity he was disabled to become the purchaser of the company's property for his benefit. He could only acquire it in trust for the benefit of the partnership. No purchaser from him, charged with notice of these facts, could occupy any better position than he occupied. See Rorer on Judicial Sales, section 110 ; *Michoud* v. *Girod,* 4 Howard, 503 ; *Wormley* v. *Wormley,* 8 Wheat. 421 ; *Prevost* v. *Gratz,* 6 Wheat. 481 ; and 2 Minor's Inst. 194–5, where it is said "joint tenants and coparceners stand in such confidential relations in regard to one another's interests, that one of them is not permitted in equity to acquire an interest in the property hostile to that of the other ; and, therefore, if one purchase an encumbrance on the joint estate or an outstanding title thereto it will enure to the equal benefit of all. Agents are emphatically within the same principle." If agents are thus held, then, of course, partners, as such, are mutual agents, the one of the other. F. L. Hale was charged with the relation of trust and confidence both as partner and agent. It is needless to multiply authorities. Let it suffice here to refer to Bispham's Equity, sections 91, 92, 94, 135 and 269 ; Freeman on Co tenancy, 151, *et seq.;* Parsons on Partnership, pages 223–4, where it is said: " If a partner by any means gets possession of a fund properly belonging to the firm, he must share any profit or advantage arising from it with his co-partners." See also Pollock's Dig. 77. It is perfectly clear that F. L. Hale, bearing the relation he did to the company, could purchase and hold the property of the company only subject to the equities of his co-partners.

2d. Does the invalidity of F. L. Hale's title, and its encumbrance with the equities of his co-partners affect the title of his alienees?

This depends solely upon the question, did they have or were they charged with notice of these equities when they purchased, paid for and received their conveyance of the property?

It makes no difference whether the equities charged on the property are expressly so charged, or only impliedly so charged.

See *Downman* v. *Rust,* 6 Ran. 587, where Carr, J., delivering the opinion of the court, said : "The counsel referred to no case which took this distinction between an express and an implied charge, nor have I been able to find any. *   *   *   * The counsel placed it on the ground of fraud, and said it would be harsh doctrine to pronounce it fraudulent in a purchaser to deal with Rust as owner of the land, when there was a clear devise of it to him, and the charge was so far from being clearly such that none but a lawyer would detect it. But I see none of the cases, nor of the elementary writers, placing this doctrine on the foot of fraud. It seems to depend rather on the doctrine *caveat emptor;* he who purchases from another must look to the title, must know the authority of the seller. Whether the charge on the land be express or implied, if it is a charge, it equally binds, and must equally be protected."

Notice may be actual or constructive, and whether the one or the other, the result is the same. And it is the settled doctrine that whatever circumstances are sufficient to put a purchaser upon an inquiry which would lead to a discovery of the trust, will be good constructive notice. Hill on Trustees, pp. 510–512.

In *Wood and als.* v. *Krebbs and als.,* 30 Gratt. 715, where all the authorities bearing on this subject are cited, this court declared : " The purchaser (as in the case before us), claims to be entitled as a *bona fide* purchaser. Certainly a *bona fide* purchaser for value and without notice, is a great favorite of a court of equity, and that court will not disarm such a purchaser of a legal advantage. But we must not permit ourselves to be misled by words or maxims in this matter. Other persons are entitled to the protection and favor of a court of equity, as well as purchasers. Creditors are such persons. *   *   *   * Purchasers are bound to use a due degree of caution in making their purchases, or they will not be entitled to protection. *Caveat emptor* is one of the best settled maxims of the land, and applies exclusively to a purchaser. He must take care to make due inquiries, or he may not be a *bona fide* purchaser. He is bound not only by

*actual*, but also by constructive notice. He must look to the title papers under which he buys, and is charged with notice of all the facts appearing upon their face, or to the knowledge of which anything there appearing will conduct him. He has no right to shut his eyes or his ears to the inlet of information, and then say he is a *bona fide* purchaser without notice."

And in *Long & al.* v. *Weller's Ex'or*, 29th Gratt. 347, Burks J., says: "Wherever inquiry is a duty, the party bound to make it is affected with knowledge of all which he would have discovered had he performed his duty."

In *Cardova* v. *Hood*, 17 Wall. 1, Mr. Justice Strong says: "Means of knowledge, with the duty of using them, are, in equity, equivalent to knowledge itself." No other authorities are needed.

Let us now apply these principles to the case under consideration. It was the duty of these purchasers to look into the title they were buying. We have seen that the means were plainly within their reach. To them the maxim *caveat emptor* is, in all its rigor, strictly applicable. What were the circumstances? What were their means of knowledge?

This mining partnership was unlike ordinary trading partnerships in a remarkable feature. In the latter there is always what is implied by the phrase "*dilectus personarum.*" In them no one can become a partner without the consent of the rest. In mining partnerships, like that under consideration, there was no "*dilectus personarum.*" Each member could transfer his share to any other person, and that person become, *ipso facto*, a member of the company, occupying the same relation thereto that the original member occupied. This was the distinguishing feature of this company as a mining partnership, and it made the membership changeable and uncertain. But it was a principle of law, and all persons dealing with the company or with its property, were and are bound to take notice of it. See Parsons on Partnership, 173 ; Collier on the Law of Mines, 126.

That said company was a mining partnership and never in-

corporated, and what were the relations of F. L. · Hale to that
company when he became the purchaser of its property, which
was treated as real estate throughout, by both parties and courts,
what was the judgment for the satisfaction of which Carter's suit
was brought, against whom it was, against whose real estate it
was sought to be enfored, who were the parties to that suit, that a
decree was not binding on members who were not parties; that
all the members should have been parties; that G. B. Lamar
was a member, and should have been made a party, but was not;
that F. L. Hale, being a member and general superintendént,
could not buy the company's property for his own benefit, but only
for the benefit of the company; all matters of fact and of law, and
about which it was the plain duty of these purchasers to make
inquiry, and all which was readily discoverable from and by the
means and opportunities at hand, ready for examination, there
can be no question.  There were the articles of partnership on
record; the law of the case presumably known to all; the min-
utes of the proceedings of the members accessible to every one
interested in knowing their contents; the record of the Carter
judgment against F. L. Hale, as general superintendent of the
company; the record of the Carter chancery suit, or, at least
the memorandum showing who were the parties and the object
of the suit; the decree of sale ; the decree confirming the report
of sale and ordering Tipton, *after having first given bond as re-
ceiver,* to collect the purchase money and convey the property to
the purchaser, and report to court for confirmation ; the deed of
conveyance of the property of the company sold under the de-
cree in the Carter suit, reciting the style of the suit, and with
the other papers indicating the relations of F. L. Hale to the
company; the two decrees, the purchase by F. L. Hale, reciting
also the payment of the purchase money by him, but not that
the required bond had been executed ; the absence of any de-
cree confirming the action of the commissioner ; the absence of
the bond itself, and of any evidence that it had ever been given.
There was also F. L. Hale himself, partner, superintendent, judg-

ment debtor, defendant in chancery suit, and purchaser of the property of his co-partners; and there was Carter, the former clerk, and the creditor of the company. From each and every one of these sources it behooved these purchasers to seek information; but to all of them they closed their eyes and ears. They had no right to neglect these ready sources of information and then claim to be *bona fide* purchasers for value without notice. If they *did* examine these sources of information then they must have obtained notice of the equities with which the company's property was charged in the hands of F. L. Hale. If they *did not* examine them they were guilty of laches; the law imputes notice to them, and they were not *bona fide* purchasers for value without notice of these equities.

Again, the suit of Carter against the surviving members of the company, appears from the record, to have been instituted for the purpose of enforcing the lien of a judgment at law in favor of Carter against F. L. Hale, on and out of the property of the company, treated as real estate. The Code of 1849, ch. 186, § 9, gives courts of equity jurisdiction always to enforce the lien of a judgment against the real estate of the judgment debtor—*not of another.* The county court of Carroll county in 1859, had jurisdiction to enforce Carter's judgment lien on the real estate of his judgment debtor, F. L. Hale, and on his interest in the real estate of the company, but certainly not on the interests of the other members; and *a fortiori*, not against the interest of G. B. Lamar, who was not only not a party to the judgment at law, but not even a party to the chancery suit.

This appearing on the face of the papers, what rights could the alienees acquire against G. B. Lamar, or any of the partners other than F. L. Hale, by virtue of the sale made under the decree in that suit? It is true that a judgment or decree of a court of record cannot be impeached in another suit, except for want of jurisdiction in the court, or fraud in the parties. Every presumption must be drawn in favor of the jurisdiction of a court of general jurisdiction. If several grounds of jurisdic-

tion are apparent from the record, whereon the court might have acted, it will be presumed to have acted on that which lawfully gave it jurisdiction, and not upon the others which did not. See *Woodhouse* v. *Fillbates*, 77 Va. (2 Hansbrough), 317. But here the only ground of jurisdiction apparent on the record, is one which could not lawfully give the county court of Carroll county the jurisdiction exercised by it, viz: the enforcement of a judgment lien on the real estate of one party against the real estate of another party.

And again, the decree by which Tipton, commissioner, was ordered to collect the purchase money, and to convey the property to F. L. Hale, was, on its face, inoperative until the commissioner had given the bond thereby required. Neither by recital in the deed of conveyance from him to F. L. Hale, nor otherwise, does it appear that such bond was ever given. It was certainly the purchaser's duty to see that the required bond was given before paying the purchase money. They could not make a valid payment until the bond was given. Nor could they become entitled to a deed until the purchase money was validly paid. A deed made before the purchaser becomes entitled thereto has no validity, unless subsequently validated by confirmation of the court. Of such confirmation in this case there is no proof. See Code 1849, ch. 178, § 1; *Hess* v. *Rader*, 26 Gratt. 746; *Bodkin* v. *McAllister*, 76 Va. (1 Hansbrough) 809.

It is in evidence here that the papers in the suit of *Carter* v. *F. L. Hale and als.*, are mostly lost, but not that the order-books of the court were lost, wherein the decrees are recorded. Two other decrees in the same suit are exhibited. The presumption, then, is irresistible that had a decree confirming the action of Tipton in making the deed to F. L. Hale ever existed, it, too, would have been exhibited. These defects also were open to observation. The records could not be looked to without disclosing them. For these reasons we are of opinion that these alienees are not purchasers for value without notice.

2d. Is the claim of G. B. Lamar barred by the statute of lim-

itations? There are allegations of adversary possession in the alienees of F. L. Hale, but no proof thereof. Such proof is necessary. Its absence seems decisive of the question. But if there were such proof, the statutory bar could have no application in this case. The possession of F. L. Hale was fiduciary; at first, expressly so; afterwards, impliedly so. 2 Minor's Inst. 513–14; 1 Barton's Chy. Pr. 82. "The rule that the statute of limitations has no application to trusts, applies to all acting trustees, whether regularly appointed or not." Perry on Trusts, § 863. The trust follows the property into the hands of a purchaser with notice of the trust, and no statutory bar of limitation applies thereto. *Rankin* v. *Bradford,* 1 Leigh 171; *Hunter* v. *Spotswood,* 1 Wash. 145; *Redwood* v. *Riddick,* 4 Munf. 222; *Turner* v. *Campbell,* 3 Gratt. 77; *Rowe* v. *Bentley,* 29 Gratt. 762; 2 Perry on Trusts, §§ 859, 864, 865; Hill on Trustees, 264, note 3; Angel on Limitations, §§ 183, 189; 2 Pomeroy's Eq., §1052.

There was no statutory bar in this case, nor was there any equitable bar from *laches* or acquiescence.

This court in *Rowe* v. *Bentley, supra,* said: "Acquiescence cannot be imputed in the absence of all knowledge of the facts of which it is predicated." Nor can *laches* be justly charged. In the case last mentioned, this court said: "Whether the lapse of time is sufficient to bar a recovery, must of necessity depend upon the particular circumstances of each case." See also *Harwood* v. *R. R. Co.,* 17 Wall. 78.

Lamar never was in Virginia, so far as appears by the record. Before the war he resided in Georgia; afterwards, until his death in 1873, he resided in New York. F. L. Hale was the resident partner and superintendent, on whom the non-resident partners depended for information. In January, 1859, he wrote to Lamar for a remittance of $600, to pay for one share in the then recent Nowlin purchase. Carter's suit was then pending, and in April, 1859, all the company's property was sold under a decree in that suit and purchased by F. L. Hale. That letter contained no

allusion to the suit. That letter was well calculated to induce the belief, on Lamar's part, that the company was prosperous and his rights secure in the hands of his trusted agent. Lamar accordingly made the remittance. That remarkable conduct on the part of this superintendent needs no comment.

The war broke out in little more than a year after F. L. Hale's breach of trust was first manifested. The war and its disastrous effects lasted for years, and entailed on Lamar special troubles elsewhere, sufficient, naturally, to account for a withdrawal of his attention from F. L. Hale. There is nothing to show that Lamar ever heard of the Carter suit, or of the purchase of the property by F. L. Hale. The bill filed by his executor alleges that the discovery of that fact was news to him, after his father's death. The circumstances in this case, as in that of *Rowe* v. *Bentley, supra,* "sufficiently account for the delay," and repel any equitable bar to Lamar's claim.

3d. The defence of adverse possession excluding the jurisdiction of a court of equity, is peculiar to the "Toncray property," and it is fully answered by reference to the decision of the case of *Clayton and Tyson* v. *Henley,* 32 Gratt. 65, affirming the decree of the court below. For the reasons given above, this court is of opinion to reverse the decree complained of (except as to John Early, as to whom no error is assigned), and to remand the cause to the circuit court of Carroll county to be further proceeded with in conformity with this opinion.

DECREE REVERSED.