## UNITED STATES v. WYTHE COUNTY IRON & ZINC CORPORATION et al.

(District Court, W. D. Virginia.  February 26, 1926.)

1. Vendor and purchaser ⬳235 — "Purchaser for valuable consideration," in ancient Registry Act, held to include grantee who has merely promised to pay purchase price (Rev. Code Va. 1819, c. 99).

Contrary to modern general law, "purchaser for valuable consideration," in the ancient Virginia Registry Act (Rev. Code Va. 1819, c. 99), is not limited to a complete purchaser, but includes a grantee, who has merely expressly or impliedly promised to pay the purchase price; the expression being used with its meaning in the law of contracts.

2. Vendor and purchaser ⬳231(4)—"Subsequent purchasers," to whom recording of mortgage is notice, include only purchasers after the recording (Rev. Code Va. 1819, c. 99, §§ 4, 12).

Within Rev. Code Va. 1819, c. 99, § 12, which provides that deed recorded within eight months after the sealing and delivery thereof shall be valid as to all persons, but that mortgages, whenever recorded, shall take effect and be valid as to all subsequent purchasers for value, without notice, from the time of recording, and from that time only, "subsequent purchasers" are those purchasing after the recording, though in section 4, relating only to unrecorded instruments, it means those purchasing after the date of delivery of the unrecorded instrument.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Subsequent Purchaser.]

3. Vendor and purchaser ⬳231(10) — Good title to Virginia land, as against prior mortgage subsequently recorded, held obtained by purchaser for valuable consideration, who afterwards became complete purchaser without notice.

A purchaser of Virginia land for valuable consideration, being under statute not charged

with notice of a prior mortgage by subsequent recording thereof, and thereafter becoming a complete purchaser, by payment of all the purchase price, without notice, got good title as against mortgage.

**4. Vendor and purchaser ⬅238—Grantee of bona fide purchaser, who got good title as against mortgage, gets like title, though having notice of it.**

Grantee of land having, because of absence of notice, good title against prior mortgage, subsequently recorded, his grantee gets like title, though having notice.

**5. Vendor and purchaser ⬅242.**

In Virginia, burden of proving notice to junior purchaser is on those claiming under the senior.

**6. Vendor and purchaser ⬅244—That grantee, before selling, had become a complete purchaser without notice, and so had good title against prior mortgage subsequently recorded, held fairly indicated by his deeding with general warranty.**

That grantee of land, not having constructive notice of prior mortgage, and not shown to have had actual notice thereof, deeded it with general warranty, *held* to fairly indicate that he had become a complete purchaser, by payment of all the purchase price, without notice, and so had good title as against the mortgage.

**7. Taxation ⬅855—There is no probative value in recitals of deed made under naked power to release lands vested in Literary Fund by failure to pay taxes (Acts Va. 1830, c. 133).**

Deed made by officers of Literary Fund in execution of naked power given by Acts Va. 1830, c. 133, releasing to E. such of his lands as, because of failure to pay taxes, have been vested in such fund, *held* subject to rule that recitals in tax deed have no probative value; there never having been any possession under it.

**8. Taxation ⬅855—Deed under naked power given by statute held to vest no title to lands not shown delinquent or vested in the Literary Fund at date of statute (Acts Va. 1830, c. 133).**

Deed of land, under naked power given by Acts Va. 1830, c. 133, to officers of Literary Fund, to release land, which, because of failure to pay taxes, "have been vested" in such fund, gave no title to lands which are not shown to have been delinquent, or vested in such fund at date of the statute.

**9. Eminent domain ⬅152(1) — Notorious and long-continued dominion by claimant of fund from condemnation of two small tracts held to justify belief that exceptions in private deeds of larger tract were outside condemned tracts.**

Relative to right to fund from condemnation of two small tracts, claimant's notorious and long-continued dominion of such tracts justifies belief that undescribed and unlocated exceptions in private conveyances of larger tract, embracing the smaller tracts, were outside the condemned tracts.

**10. Eminent domain ⬅152(1)—Possession of tracts condemned within patent making unlocated reservations raises no presumption, entitling possessor to compensation, that state ever granted tracts reserved, or that they do not conflict with tracts condemned.**

Long and notorious possession of tracts condemned, within the bounds of a patent reserving tracts described merely as of certain number of acres and the entries or surveys of certain persons, raises no presumption, entitling the possessor to the compensation, that the state ever granted the tracts reserved, or that they may not conflict with those condemned.

**11. Courts ⬅302.**

Jurisdiction of action by United States to condemn land of state is exclusively in Supreme Court of United States.

**12. Eminent domain ⬅158—Compensation not distributed without proof of prima facie right, where tracts are within patent making unlocated reservations.**

Compensation in suit to condemn land within patent which made unlocated reservations may not be distributed till at least prima facie right to it has been proved.

**13. Eminent domain ⬅158.**

In condemnation suit, in Virginia, burden of locating reservations in patent rests on claimant of compensation, who claims under patent.

**14. Eminent domain ⬅158—Expenses and allowance of commissioner to determine distribution of compensation are only costs to be paid from fund.**

The only costs of reference to determine proper distribution of fund in condemnation suit, to be paid therefrom, are the allowance to the commissioner and the expenses to which he has been put; expenses of claimants not being a charge thereon.

At Law. Condemnation proceeding by the United States against the Wythe County Iron & Zinc Corporation and others. On exceptions to report of commissioner to determine distribution. Judgment in accordance with opinion.

R. T. W. Duke, Jr., of Charlottesville, Va., and Caldwell & Chaney, of Roanoke, Va., for Iron & Zinc Corporation.

Edw. C. Martz, of Harrisonburg, Va., for Crary heirs.

Thos. F. Walker, of Wytheville, Va., for Sheldon.

McDOWELL, District Judge. All the facts necessary to an understanding of the following opinion are stated therein, except as follows:

By Act of February 22, 1830 (Acts Va. 1830, c. 133), the Virginia Legislature authorized the president and directors of the corporation known as the Literary Fund to

release to .Lewis Eisenminger such portion of his lands as, because of failure to pay taxes, "have been vested" in the Literary Fund, on such terms as shall seem to them to be equitable and just. By deed of July 3, 1845, the president of the Literary Fund released and conveyed a number of large tracts of land, on payment of the long delinquent taxes thereon, without interest, to Gray and Osborne, creditors of Eisenminger. The tracts that have been expropriated contain, respectively, 3,718.19 acres and 105.37 acres, and both lie within the 35,500-acre boundary set out in the Swan patent. The questions discussed have arisen in a contest over the funds derived from these two tracts.

On Exceptions to Commissioner's Report.

1. *The Paper Title.*—The land which has been expropriated in this case is a part of a tract of 33,000 acres granted August 27, 1795, by the commonwealth to James Swan. Thereafter Swan conveyed this and many other large tracts of land to trustees for the benefit of his creditors, one of whom was Lewis Eisenminger. On July 19, 1826, Eisenminger, not then having legal title thereto, conveyed the 33,000-acre tract by deed of trust to Williams and Pendleton, trustees, to secure certain creditors. This deed was first admitted to record on March 25, 1833. It will hereafter be referred to as the Williams deed of trust.

In April, 1827, Eisenminger brought a suit for partition of the lands conveyed in trust by James Swan in the superior court of chancery for the city of Richmond, which resulted in a conveyance, dated April 15, 1828, by Anderson, commissioner, to Eisenminger, inter alia, of the 33,000-acre tract. On August 7, 1832, Eisenminger (by his authorized attorney in fact, Leonard Straw) sold and conveyed the said 33,000-acre tract to James Hector, "in consideration of the sum of fifteen hundred dollars lawful money of the United States to him in hand paid, the receipt whereof is hereby acknowledged." On February 26, 1834, Hector conveyed, inter alia, the 33,000-acre tract in trust to Boyd, trustee, to secure a number of debts to Hector's creditors. The following is quoted from the description:

"The right, title, interest, and claim of the said James Hector in and to the following tracts or parcels of land to wit: One of 500,000 acres lying in the counties of Giles, Tazewell and Logan and surveyed for Wilson Carey Nicholas, lying on the flat top mountain, the waters of Blue Stone, Guyandotte and Sandy; 100,000 acres, part of a tract lying in the counties of Tazewell and Logan on the waters of Sandy and surveyed for Wilson Carey Nicholas; one tract of 340 acres, lying in Tazewell and Logan on the Rich Mountain, and bought by said Hector of George Bailey; one tract, being part of a survey made for James Pine, lying in Giles; one tract of 2,500 acres, granted to John Stockdale, lying in Giles; part of a tract granted to Alex Boyd, lying in Tazewell; part of a tract surveyed for Alexander Stuart, also .in Tazewell; one-third of 57,000 acres of land lying in Tazewell, granted to Thomas Willson subject for the purchase money; one tract of 33,000 acres, lying in Wythe and Grayson, purchased of Leonard Straw, agent for Lewis Eisenminger, subject for $1,500 purchase money; one tract of 10,000 acres on Coal river, in Lafayette county, granted to Wm. Whitcroft; one-third of 2,000,000 of acres purchased of James W. Denny, of Frankfort, Kentucky, subject to the purchase money, lying in the western part of Virginia; one-third of certain lands in Cabell and Logan, surveyed for James Madison and Agatha and Susanna Madison, subject to .the purchase money; one-half of 4,500 acres on Meadow river, Greenbrier county, subject to purchase money; one-half of several tracts in Botetourt county, subject to purchase money; and one tract of 200 acres, purchased of Thomas J. Morrison, lying on Reed Island in Grayson county."

On April 8, 1846, Boyd, trustee, foreclosed the deed of trust, and on the next day conveyed the 33,000-acre tract to one James H. Piper. The following is copied from the deed:

"The said tracts of land having been sold separately and for the following sums, to wit: Seventy-five dollars for the tract first named in said deed of trust; five dollars for the second named tract; five dollars for the third named tract; one dollar for the fourth named tract; five dollars for the fifth named tract; two dollars and twenty-five cents for the sixth named tract; one dollar for the seventh named tract; five dollars for the eighth named tract; eighty-five dollars for the ninth named tract; five dollars for the tenth named tract; twenty dollars for the eleventh named tract; one dollar for the twelfth named tract; one dollar for the thirteenth named tract; one dollar for the fourteenth named tract; and two dollars and fifty cents for the fifteenth (and last) named tract."

The 33,000-acre tract is the ninth tract

mentioned in the deed of trust from Hector to Boyd, trustee. The Wythe County Iron & Zinc Corporation claims under Piper. On October 12, 1843, Williams (surviving trustee in the deed of trust of 1826) foreclosed the trust, sold the land to Gray and Osborne, and on November 27, 1843, made conveyance to the said purchasers. The Crary heirs and Sheldon claim under this chain of title. The Crary heirs and Sheldon have offered no evidence of notice to Hector of the Williams deed of trust, other than the fact that it was admitted to record in 1833. The opposing claimants have offered no evidence, other than the title papers above mentioned, as to when, if ever, Hector became a complete purchaser.

. The recital in the deed of trust from Hector to Boyd that the 33,000-acre tract is conveyed "subject for $1,500 purchase money" is an admission, binding on all claiming under Hector, that he had not in 1834 paid any part of at least the principal of the agreed purchase price. However, I cannot find in the deed from Boyd to Piper satisfactory evidence that Hector may not, in the 12 years between 1834 and 1846, have become a complete purchaser. The fact that 33,000 acres of land sold for $85 might tend to show that it was still subject to Eisenminger's equitable vendor's lien for some or all of the purchase price. But in the same deed we find that a 500,000-acre tract, not subject to a vendor's lien, sold (whether to Piper or to others does not appear) for $75, and a tract of 100,000 acres, also not subject to any lien, for $5; while the 33,000-acre tract in suit sold for $85. Moreover, the absence of a recital in the deed from Boyd to Piper that the land had been sold to him subject to the payment of purchase money has some tendency, even if slight, to show that Hector had, between 1834 and 1846, paid or otherwise satisfied Eisenminger's claim for purchase money

Since the foregoing was written, the Zinc Company has, by consent, filed a deed, dated May 25, 1843, from Hector to James H. Piper, "in consideration of the sum of one dollar and other valuable considerations to him in hand paid, the receipt whereof is hereby acknowledged," whereby Hector conveys the 33,000-acre tract *with general warranty*. The deed of trust of 1834 from Hector to Boyd was admitted to record in Wythe county on February 27, 1834. It is not improbable that Hector was by the deed of 1843 conveying to Piper what was known to both to be Hector's mere equity of redemption. But in any event it seems most im-

probable that Hector would have conveyed to Piper with general warranty, if he (Hector) had not before that time paid the balance of the purchase money to Eisenminger.

The registry statute in force from 1819 to 1849 was the Act of February 24, 1819, c. 99 (1 Rev. Code 1819, p. 361 et seq.). As a matter of convenience I shall in the following discussion substitute the word "recording" for the statutory expression "delivered to the clerk," or "lodged with the clerk for record." Sections 4 and 12 of that statute read as follows:

Section 4: "All bargains, sales and other conveyances, whatsoever, of any lands, tenements or hereditaments, whether they be made for passing any estate of freehold or inheritance, or for a term of years, and all deeds of settlement upon marriage, wherein either lands, slaves, money or other personal thing shall be settled or covenanted to be left or paid, at the death of the party or otherwise; and all deeds of trust and mortgages whatsoever which shall hereafter be made and executed, shall be void, as to all creditors and subsequent purchasers 'for valuable consideration, without notice,' unless they shall be acknowledged or proved, and 'lodged with the clerk to be recorded, according to the directions of this act; but the same, as between the parties, and their heirs,' and as to all subsequent purchasers, with notice thereof, or without valuable 'consideration,' shall nevertheless be valid and binding."

. Section 12: "Every conveyance, covenant, agreement and other deed in this act mentioned, except deeds of trust and mortgages, which shall be acknowledged, proved or certified according to law, and delivered to the clerk of the proper court, to be recorded, within eight months after the sealing and delivery thereof, shall take effect and be valid, as to all persons, from the time of such sealing and delivery; but all deeds of trust and mortgages, whensoever they shall be delivered to the clerk to be recorded, * * * shall take effect, and be valid as to all subsequent purchasers for valuable consideration, without notice, and as to all creditors, from the time when such deed of trust or mortgage, or such other conveyance, covenant, agreement or deed, shall have been so acknowledged, proved or certified, and delivered to the clerk of the proper court, to be recorded, and from that time only."

[1] In considering the effect on Hector of recording in 1833 the Williams deed of trust, it is necessary to discriminate sharply between a purchaser for valuable consideration

and a complete purchaser for valuable consideration. A grantee who, for instance, pays a third of the purchase money cash down at the date of the delivery of the deed to him, and promises to pay the balance later, becomes immediately a purchaser for valuable consideration, although not then a complete purchaser. Moreover, I believe that a grantee who pays no part of the purchase money at the time the deed to him is delivered, and who, expressly or impliedly,· merely promises to pay the purchase price in the future, is, within the meaning of the Registry Act of 1819, a "purchaser for valuable consideration."

I fully understand that by the present-day rule of the general law a grantee who merely impliedly promises to pay the purchase price is not regarded as a purchaser for a valuable consideration. 2 Pomeroy, Eq. (2d Ed.) § 751; 23 Am. & Eng. Ency. (2d Ed.) p. 487. In 39 Cyc. 1701–1703, it is said:

"Actual payment of the purchase money is in general necessary to the character of a bona fide purchaser for a valuable consideration, and this must, in most jurisdictions, be shown independently of the recitals in his deed, which do not constitute proof of such payment. * * * The giving of a mortgage or other security for the payment of the purchase price, or even the giving of negotiable notes, will not be sufficient to entitle one to the rights of a bona fide purchaser, unless the parties are so circumstanced that a court of equity cannot prevent the enforcement of such security or notes, as where the notes have been negotiated and transferred into the hands of an innocent purchaser for value."

But the modern general law does not control in the construction of an ancient Virginia statute. In that old and still highly esteemed Virginia text-book, 1 Lomax's Digest of the Laws of Real Property (2d Ed.) at page 511, it is said:

"In the conflict between successive incumbrancers, purchasers or mortgagees, the existence of a valuable consideration is an essential element of that equity, which is administered in chancery on deciding upon their priorities. To create a defense against prior equities, there must be something more than a conveyance without consideration, or merely in consideration of natural love and affection; the purchaser must be a purchaser for valuable consideration, as well as in the technical sense of the common law. This requisition excludes purchases made merely upon a good and meritorious consideration,

as distinguishable from the consideration of benefit to the person making a promise, or a loss, trouble or inconvenience to, or charge upon, the person to whom it is made."

In 2 Minor's Insts. (4th Ed.) p. 234, another highly esteemed Virginia text-book, it is said of the doctrine of innocent purchaser:

"A valuable consideration is never mere love and affection; but it must be a·benefit to the grantor, or to a third person at his request, or some loss, trouble, or inconvenience or the risk thereof to the grantee."

In Cammack v. Soran, 71 Va. (30 Grat.) · 292, 297 (1878), Judge Staples, as an additional reason for the conclusion reached, said:

"The idea that the Legislature used the words 'purchaser for valuable consideration' in one sense in the statute relating to fraudulent conveyances, and in an entirely different sense in the statute relating to registration, is purely conjectural, and not warranted by anything in our legislation."

In the Cammack Case the statute referred to is of later date than the act of 1819, but the language is in the respect in question the same. It may be added that in the act of 1819 there is a provision against voluntary conveyances, and that it is most improbable that at that period the Virginia lawmakers intended the expression "purchaser for valuable consideration" to have any meaning other than its familiar meaning in the law of contracts. In that period very fine discriminations were not often made. In the sense in which the words are used in the law of contracts, Hector was in 1832 a purchaser for a valuable consideration. If, as I think is the fact, he did not then pay the purchase price in full, he impliedly (and perhaps by the execution of a note or purchase-money bond expressly) promised to pay, and this was a valuable consideration.

In 2 Devlin on Real Estate (3d Ed.) § 830, is a quotation from Gully v. Grubbs, 1 J. J. Marsh. (Ky.) 387, 389 (1829), which in part reads:

"The authorities on this subject in England, as well as in the states of this Union, are various and contradictory. But we believe that the consistent doctrine, and that which accords best with analogy, and with the practice and understanding of mankind, is that an acknowledgment in a deed of the receipt of the consideration is only prima facie evidence of payment. The acknowledgment is inserted more for the purpose of showing the actual amount of consideration than its payment, and it is generally inserted

in deeds of conveyance, whether the consideration has been paid or only agreed to be paid. If the consideration has not been paid, such an acknowledgment in a deed would be intended to mean that the specified amount had been assumed by note or otherwise. * * * The acknowledgment of the payment of the consideration in a deed is a fact not essential to the conveyance. It is immaterial whether the price of the land was paid or not, and the admission of its payment in the deed is generally merely formal. But if it be inserted for the purpose of attesting the fact of payment (as it seldom, if ever, is in this country), it is not better evidence than a sealed receipt on a separate paper would be, and, as we have already said, it seems to us that it would not be as good, for obvious reasons. The practice of inserting such acknowledgments in deeds is very common, whether the consideration had been paid or not. 'For and in consideration of $———, in hand paid,' etc., is a commonplace phrase, which may be found in deeds generally. And it is seldom intended as evidence of payment, or for any other practical purpose, except to show the amount of consideration. * * *"

And even if Hector executed no purchase-money note or bond to Eisenminger, Hector's acceptance of the deed created an implied obligation to pay the agreed purchase price at least within a reasonable time.

[2-6] The next question is whether or not the mere recording of the Williams deed of trust in 1833 imputed notice thereof to Hector. It is here advisable to repeat a part of section 12 of the act of 1819:

"All deeds of trust and mortgages * * * shall take effect, and be valid as to all subsequent purchasers for valuable consideration, without notice, and as to all creditors from the time when such deed of trust or mortgage * * * shall have been * * * delivered to the clerk of the proper court to be recorded, and from that time only. * * *"

Until 1887 (Code 1887, § 2472), a junior purchaser, who received notice of a prior incumbrance or sale before he became a complete purchaser, was given no lien on the land for partial payments of purchase money made before notice. Notice to a junior purchaser after payment of 99 per cent. of the purchase price, and notice after payment of 1 per cent. would, prior to 1887, have been equally disastrous to the junior purchaser. And if the earlier registry statutes had been intended to make the belated registration of title papers apply to those who had become

purchasers for value, but not complete purchasers, before the recording, the result would have been to seriously curtail the number of sales of land on time, or partly on time. Unless the honesty of the vendor was to the knowledge of the vendee beyond suspicion, or unless the wealth of the vendor was so great that the vendee would regard his continued solvency as a practical certainty, few prudent purchasers would have been willing to buy, except for all cash; and it is certainly highly improbable that the lawmakers, during the long period in question, should have intended to put such a serious obstacle in the way of free alienation of land. Dilatory, negligent creditors never deserved such unfairly preferential treatment at the hands of the lawmakers, and it is difficult to believe that an intent to accord it has ever existed.

The language above quoted from section 12 also applies to (lien) creditors of the vendor who became such before the recording of the deed of trust. And if recording destroyed the title of one who had previously become a purchaser for value (although an incomplete one), such recording also destroyed the rights of the vendor's lien creditors whose judgment or other liens had been obtained and duly docketed or recorded between the delivery and the recording of the deed of trust or mortgage. That such should have been the intended effect of the registry statutes is unbelievable. The failure of the mortgagee to record his mortgage gave his mortgagor a fictitious credit, and certainly the lawmakers never intended that such mortgagee could, by a belated recording of his mortgage, destroy the security of the duly diligent judgment and other lien creditors of the mortgagor.

It seems to me that the only reasonable construction of the clause above quoted from section 12 of the act of 1819 is that it applies only to purchasers and creditors who become such after the recording of the deed of trust or mortgage. It is true that in section 4 (which relates only to unrecorded instruments) the expression "subsequent purchasers" means those who purchase after the date of the delivery of the prior instrument. But in section 12 the expression "subsequent purchasers" means those who purchase after the recording of the prior instrument. Most certainly section 12 was not intended to give to the recording of deeds of trust or mortgages a retroactive effect. The recording within eight months after sealing and delivery of conveyances other than deeds of trust and mortgages is by section 12 given

a retroactive effect. But the recording of deeds of trust and mortgages is expressly declared to be effective from the time of recording, "and from that time only."

And if the mere (belated) recording of a deed of trust is held to be valid as to one who had purchased for value prior to the recording, merely because he had not at the time of the recording of the deed of trust become a complete purchaser, the recording of the deed of trust is given a retroactive effect, and the express words of section 12 are disregarded. In other words, the mere recording of a deed of trust puts on notice those who become purchasers or creditors after recording, but as to those who become purchasers or creditors before recording the recording itself is of no effect. As of course the right of the ·junior purchaser in the land, so long as he has not become a complete purchaser, was prior to 1887 wholly defeated by notice of the prior incumbrance; but the mere recording of such incumbrance after the junior became a purchaser for value did not put him on notice, because otherwise the recording of the incumbrance would be given a retroactive effect.

I have not been able to find any Virginia case in which it appeared that a senior deed of trust or mortgage had been admitted to record after the junior purchaser had obtained a deed and had paid a part of the purchase money (or had impliedly promised to pay the purchase money) and before the junior had become a complete purchaser. In a number of cases it has been held that notice to a junior purchaser before he becomes a complete purchaser invalidates his title. See, for instance, Doswell v. Buchanan, 3 Leigh (Va.) 365, 384, 23 Am. Dec. 280; Wasserman v. Metzger, 54 S. E. 893, 105 Va. 744, 7 L. R. A. (N. S.) 1019; Bugg v. Seay, 60 S. E. 89, 107 Va. 648, 122 Am. St. Rep. 877. But in all such cases the junior purchaser was put on notice, actual or constructive, before he became a complete purchaser. And I here use the term "actual notice" as meaning knowledge of the existence and purport of the prior deed, and the term "constructive notice" as meaning knowledge of circumstances which, if inquired into, would have given actual notice and which should have been inquired into.

The most satisfactory conclusion I can reach is that the mere recording in 1833 of the Williams deed of trust did not impute notice to Hector. And there is no other evidence of notice to Hector, either actual or constructive. And if Hector became a complete purchaser without notice prior to his

conveyance in 1843 to Piper of the equity of redemption, Hector's innocence would protect Piper and all those who claim under him, although Piper took with imputed notice of the Williams deed.

While the rule differs in different states (23 R. C. L. pp. 247, 248), in Virginia it is held that the burden of proving notice to the junior purchaser rests on those claiming under the senior. Lamar v. Hale, 79 Va. 147. In the case at bar, as has been said, there is no evidence that Hector was ever put on notice, actual or constructive, of the existence of the Williams deed of trust. And the fact that Hector in 1843 conveyed to Piper with general warranty fairly indicates that previous to that date Hector had become a complete purchaser, and also that up to that time he had acquired no knowledge or intimation of the Williams deed of trust. It follows that Hector must be regarded as a purchaser for valuable consideration, who became a complete purchaser without notice. The result is that the Williams deed of trust and the title claimed under it are invalid.

[7, 8] 2. *The Tax Title.*—The Crary heirs and Sheldon contend that they have the true paper title to the 33,000-acre tract by virtue of a deed made July 3, 1845, by Gov. James McDowell, president of the Literary Fund. This deed was indisputably made in execution of a naked power. The officials composing the body corporate known as the Literary Fund (1 Rev. Code 1819, p. 83, § 6) had no personal or private interest or right whatsoever in delinquent lands. The deed in question is therefore subject to the rules relating to tax deeds, in respect to the probative value of its recitals. Neither the Crary heirs, nor Sheldon, nor any of their predecessors in title, have ever had possession of any sort of any part of the 33,000 acres, nor have they ever exercised dominion of any sort over any part of the land. If they, or any of them, have since 1845 ever paid a penny of taxes on the land, the evidence does not show such fact. On the other hand, the Zinc Company and its predecessors in title had for nearly 40 years before expropriation exercised an exclusive and notorious dominion over, and control of, the land in question. They have also paid the taxes for many years. I have not yet studied the evidence concerning the possession of the land by the Zinc Company and its predecessors sufficiently to be able to say whether or not that company had, before condemnation of the land in suit, acquired title thereto by adversary possession. However, it does certain-

ly appear that for more than one period of several years the Zinc Company and its predecessor had the land in actual, notorious, exclusive, and hostile possession.

In such circumstances, the recitals in the tax deed cannot be accepted as evidence. See authorities cited in Virginia, etc., Co. v. Charles (D. C.) 251 F. 83, 119, 121, affirmed (C. C. A. 4), 254 F. 379, 386, 165 C. C. A. 599. The deed in question has no possible validity, unless the Act of Legislature of February 22, 1830, referred to in the deed, authorized the president and directors of the Literary Fund to release the 33,000-acre tract. The statute (Acts 1830, p. 127) in express terms relates only to such portion of the lands of Lewis Eisenminger as "have been vested" in the Literary Fund. While it appears from a certificate from the auditor of public accounts (see section 6197, Code 1919), dated March 17, 1892, that the taxes on the 33,000-acre tract were delinquent for the years 1797 to 1800, inclusive, another certificate (dated December 12, 1924) shows that these delinquencies were either paid off prior to 1816 or that at that date the land was sold to some individual. This certificate states that this tract is not on the list of tracts of land which in 1816 became vested in the Literary Fund. The first-mentioned certificate shows that the next delinquency as to the 33,000-acre tract was for the taxes of the year 1830. These taxes could not have been delinquent until months after the passage of the Act of February 22, 1830.

Inasmuch as there is no evidence that the 33,000-acre tract was delinquent, or that it had vested in the Literary Fund, the statute gave the president and directors no authority to release this tract. So far as I have been able to discover, no general law ever gave to the officials composing the Literary Fund power to release or to sell or to convey delinquent lands. And also no general law ever authorized them, or any one else, to release delinquent taxes without interest. Consequently, unless the deed was authorized by the Act of February 22, 1830, it was made without any authority and is a nullity. The deed, which embraces 14 tracts of land, containing approximately 200,000 acres, shows on its face that the supposed authority for the deed is the act above mentioned, and that the consideration was a payment of delinquent taxes, without interest. It follows that it is unnecessary to discuss the fact that power to release is not power to convey, nor the fact that power to release to Eisenminger is not power to convey, or even to release, to his assigns.

There are, I believe, other fatal defects in the deed of 1845; but it seems unnecessary to further consider this deed. It clearly did not vest Gray and Osborne (predecessors in title of the Crary heirs and Sheldon) with the paper title to the land here in question. As the Crary heirs and Sheldon have not the paper title, and as they and their predecessors have never had any possession of the land, or of any part of it, it is manifest that they can have no part of the fund.

3. *Reservations in Title Papers.*—The mere elimination of the Crarys and Sheldon, however, does not necessarily give the Zinc Company a right to the fund, or at least to the whole of the fund. The patent to Swan describes a tract of 35,500 acres. It grants to him without description 33,000 acres, and excepts from the grant nine small tracts of land, without metes or bounds, the location of no one of which has been proved. The excepting clause reads:

"But it is always to be understood that the survey upon which this grant is founded includes the following prior claims, viz.: Two hundred acres surveyed for Isaac Newhouse; two hundred acres for Soupe, lying on the headwaters of Cripple creek; two hundred and fifty acres, the property of Jacob Kemberland; eleven hundred and fifty acres entered for William Love on the waters of Cripple creek; one hundred acres surveyed for John Harmon; one hundred acres for William Burch; one hundred and fifty acres for John Fulder; one hundred and fifty acres for Dennis Fulder; and two hundred acres for Foute on the waters of Elk creek (which having a preference by law to the warrants and rights upon which James Swann's survey is founded liberty is reserved that the said prior claims shall be firm and valid, and shall have the same effect and may be carried into grant or grants, and this grant shall be no bar in either law or equity to the confirmation of the titles as before mentioned and reserved), with its appurtenances. To have and to hold the said tract or parcel of land with its appurtenances to the said James Swann, except as before, * * * and his heirs forever."

[9] In the chain of title of the Zinc Company to the two tracts of land involved in this case, there are some undescribed and unlocated exceptions other than those mentioned in the foregoing patent. The exceptions in these private conveyances, I think, should be disregarded. If the Zinc Company has not shown itself to have had good title by adverse possession, at least the notorious and long-continued dominion of the land in suit

by the Zinc Company and its predecessors in title justify a belief that the parcels excepted from the conveyances made by private individuals, while within the 33,000 acres, are not within the boundary lines of either the 3,718.19-acre tract or the 105.37-acre tract.

[10] In respect to the reservations in the Swan patent, the situation is, I think, different. With the possible exception of the 250 acres, "the property of Jacob Kemberland," no part of the 2,500 acres of reserved land at the date of the Swan survey seems to have been patented. I cannot satisfy myself that there is a presumption that entries or even surveys are subsequently carried into grant. Time does not run against the commonwealth, and there never has been in this state any officer or agent of the state under the duty of knowing the location of unpatented lands, or of preventing unauthorized possession of such lands. It follows that possession, no matter how long-continued or how notorious, of the lands in suit, creates no presumption that the commonwealth has ever granted the tracts excepted from the Swan patent, or that these tracts may not, some or all, conflict with the Zinc Company's claim.

[11-13] Jurisdiction of an action by the United States to condemn land belonging to the state of Virginia is given exclusively to the Supreme Court of the United States. The commonwealth is not and cannot be bound by any judgment rendered in this proceeding. If any of the land described in the petition in this cause belonged to the state at the institution of this suit, such land still belongs to the state. In an opinion in U. S. v. Grogg (D. C.) 9 F.(2d) 424, I have set out the reasons for saying that, in cases such as this, the fund cannot be distributed until at least a prima facie right to it has been proved, and that the burden of locating reservations in patents rests on him who claims under the patent.

The tracts in suit are No. 34,3,718.19 acres, valued at $2 per acre, $7,436.38, and No. 34-1, 105.37 acres, valued at $4 per acre, $421.48. The tracts excepted from the patent aggregate 2,500 acres. I am of opinion that $421.48 (the entire value of tract 34-1) and $4,789.26 (2,394.63 acres at $2 per acre), making a total of $5,210.74 (with the accrued interest thereon), should not be paid to the Zinc Company, at least at present. If that company, or any one claiming under it, should hereafter be able to satisfactorily locate some or all of the excepted tracts outside of the two tracts in suit, further distribution can hereafter be made.

[14] 4. *Allowance and Costs.*—The allowance asked by the special commissioner has not been excepted to, seems reasonable, and should be granted. Expenses of the claimants to a fund, whether called costs or not, should not be paid out of the fund in cases of this character. If copies of title papers are filed with the commissioner, they should be paid for by the party filing them. If depositions are taken, the witness' fees and the bill of the stenographer should be paid by the party who has the deposition taken. If witnesses are brought before the commissioner to give oral testimony, the fees and mileage of the witnesses and the bill of the stenographer who reports the evidence must be paid by the party who introduces such witnesses. If the party who incurs the foregoing expenses is unsuccessful, he assuredly has no right to be reimbursed out of the fund. If the party who incurs such expenses is successful, he receives the fund, and the expense he has gone to, to show his right to the fund, has been always within his own discretion, and is no concern of the commissioner or of the court. The only costs to be paid out of the fund which are of interest to the commissioner are the expenses to which the commissioner has been put (such as publishing notices and stenographer's charges for assistance in preparing the commissioner's report); and the commissioner's allowance.